IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

```
- - - - - - - - - - - - - - - x
                              :
In Re:                        :
                              :   Case No. 21-10492
ELDERHOME LAND, LLC,          :
                              :   (Chapter 11)
        Debtor.               :
                              :
- - - - - - - - - - - - - - - x   October 19, 2023
```

                              Greenbelt, Maryland

**MOTIONS HEARING**

[290] Motion to Amend filed by Jointly Administered Debtor
Burtonsville Crossing, LLC, Debtor ElderHome Land, LLC

[299] Response filed by Creditor EagleBank, Creditor Eagle
Commercial Ventures, LLC

[300] Opposition filed by U.S. Trustee -- Greenbelt

[301] Opposition filed by Creditor Millenium
Investment Group, LLC

[303] Response filed by Interested Party SC210034, LLC

BEFORE:  THE HONORABLE MARIA ELLEN CHAVEZ-RUARK, Judge

```
APPEARANCES:              ALAN M. GROCHAL, ESQ.
                          RICHARD L. COSTELLA, ESQ.
                          Tydings and Rosenberg
                          1 East Pratt Street, Suite 901
                          Baltimore, Maryland  21202
                            On Behalf of the Debtor

                          LISA Y. STEVENS, ESQ.
                          Office of the U.S. Trustee
                          6305 Ivy Lane, Suite 600
                          Greenbelt, Maryland 20770
                            On Behalf of the U.S. Trustee
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
APPEARANCES (Continued):   CRAIG B. LEAVERS, ESQ.
                           The Law Office of Craig B. Leavers,
                             LLC
                           P.O. Box 306
                           Cockeysville, Maryland  21030
                             On Behalf of Interested Party
                             SC210034, LLC

                           THOMAS J. KOKOLIS, ESQ.
                           Parker, Simon & Kokolis, LLC
                           110 North Washington Street
                           Suite 500
                           Rockville, MD  20850
                             On Behalf of Millenium Investment
                             Group, LLC

                           MICHAEL J. LICHTENSTEIN, ESQ.
                           Shulman Rogers Gandal Pordy
                             & Ecker, PA
                           12505 Park Potomac Avenue, 6th Floor
                           Potomac, Maryland  20854
                             On Behalf of EagleBank

Audio Operator:            Jennifer Whitfield

Transcription Company:     CompuScribe
                           P.O. Box 789
                           Cheltenham, Maryland  20623
                           (301) 577-5882
```

I N D E X

|                                                              | Page |
|--------------------------------------------------------------|------|
| General Discussion                                           | 4    |
| Opening Statements:                                          |      |
| Alan M. Grochal, Esq. Attorney for the Debtor               | 7    |
| Lisa Y. Stevens, Esq. Attorney for the U.S. Trustee        | 17   |
| Thomas J. Kokolis, Esq. Attorney for Millenium Investment Group, LLC | 17 |

| WITNESSES: For the Debtor: | DIRECT  | CROSS                                | REDIRECT | RECROSS  |
|----------------------------|---------|--------------------------------------|----------|----------|
| Thomas Norris              | 23(AG)  | 29(LS) 35(TK) 40(ML) 44(Ct)          | 45(AG)   | 48(ML)   |
| Elizabeth Norris           | 50(AG)  | 56(LS) 58(Ct)                        | --       | --       |
| For Millenium:             |         |                                      |          |          |
| Mike Patel                 | 60(TK)  | 68(AG) 69(Ct)                        | --       | --       |

|                                                              | Page |
|--------------------------------------------------------------|------|
| Closing Arguments:                                          |      |
| Alan M. Grochal, Esq. Attorney for the Debtor              | 70   |
| Lisa Y. Stevens, Esq. Attorney for the U.S. Trustee        | 77   |
| Thomas J. Kokolis, Esq. Attorney for Millenium Investment Group, LLC. | 86 |
| Rebuttal remarks by Alan M. Grochal, Esq.                  | 93   |
| Comments and Ruling by Judge Chavez-Ruark                  | 96   |

1                    P R O C E E D I N G S

2          (Whereupon, at 1:09 p.m., the proceeding began.)

3               THE CLERK:  All rise.  Silence.  Please and come to

4     order.  The United States Bankruptcy Court for the District of

5     Maryland is now in session.  The Honorable Maria Ellena

6     Chavez-Ruark, presiding.  Please be seated.

7               Calling the case of ElderHome Land, LLC and

8     Burtonsville Crossing, LLC, case number 21-10492.

9               The matters for consideration before the Court today

10    are docket entry 290, motion to modify confirmed joint plan of

11    reorganization filed by the Debtor; docket entry 299, limited

12    response to motion to modify filed by EagleBank parties;

13    docket entry 300, opposition to motion to modify filed by the

14    U.S. Trustee; docket entry 301, opposition to motion to modify

15    filed by Millenium Investment Group, LLC; and docket entry

16    303, response to motion to modify filed by SC210034, LLC.

17              Starting with counsel for the Movant, please

18    identify yourself and client for the record.

19              MR. GROCHAL:  Good afternoon, Your Honor.  Alan

20    Grochal and Richard Costella on behalf of the Debtor.

21              MR. COSTELLA:  Good afternoon, Your Honor.

22              THE COURT:  Good afternoon.

23              MS. STEVENS:  Good afternoon, Your Honor.  Lisa

24    Stevens on behalf of the United States Trustee.

25              THE COURT:  Good afternoon, Ms. Stevens.

 1              MR. LEAVERS:  Good afternoon, Your Honor.  Craig

 2   Leavers on behalf of SC210034, LLC.

 3              THE COURT:  Good afternoon.

 4              MR. KOKOLIS:  Good afternoon, Your Honor, Thomas

 5   Kokolis on behalf of Millenium Investment Group, LLC.

 6              THE COURT:  And good afternoon to you.

 7              So --

 8              THE CLERK:  Judge?

 9              MR. LICHTENSTEIN:  Your Honor?

10              THE COURT:  Oh, I am sorry.

11              MR. LICHTENSTEIN:  We filed a limited --

12              THE COURT:  You were hiding behind the monitor.

13              MR. LICHTENSTEIN:  I am sorry.  It is Michael

14   Lichtenstein for Eagle Commercial Ventures and EagleBank.  As

15   you can see from our limited response, we don't really take a

16   position on this.  But I am in the courtroom just in case.

17   Thank you.

18              THE COURT:  Understood.  Thank you.  And I assure

19   you the Court has read all of the papers.

20              Is there anyone else who wants to enter an

21   appearance?

22         (No audible response.)

23              THE COURT:  Okay.  Are the parties prepared to

24   proceed?

25              Let me --

1          MR. GROCHAL:  We are.

2          THE COURT:  Mr. Grochal, are you prepared?

3          MR. GROCHAL:  Yes.

4          THE COURT:  Okay.  Are you putting on evidence?

5          MR. GROCHAL:  We will have two witnesses.

6          THE COURT:  Okay.  And will there be any other

7   witnesses?

8          MR. KOKOLIS:  Millenium has one witness, if

9   necessary, Your Honor.

10          THE COURT:  Okay.  Thank you.

11          MR. LEAVERS:  No, Your Honor, there will be no

12   witness from my client.

13          THE COURT:  Okay.  And is everyone -- Ms. Stevens,

14   Mr. Leavers, Mr. Kokolis, everyone is ready to proceed?

15          MR. KOKOLIS:  Yes, Your Honor.

16          MS. STEVENS:  Yes.

17          THE COURT:  All right.

18          All right, Mr. Grochal, the Court will hear from you

19   by way of opening statement.

20          MR. GROCHAL:  Thank you, Your Honor.  Bear with me,

21   Your Honor, because given the number of objections and

22   responses filed, it may be a little long winded, but you will

23   tell me when to sit down, I am sure.

24          THE COURT:  We have all day.

25          MR. GROCHAL:  Okay.  Once housekeeping matter, in

1   the motion to modify, we indicated Millenium would be paid 12

2   percent on its debt until repaid.  And that was a

3   misstatement.  They will -- it will be accrued, but they are

4   the first position lender and there seems to be ample equity

5   in the property.  So whenever -- however it is disposed of,

6   they will get paid in full with 12 percent interest tacked on.

7            The -- let me just give a brief chronology.  The

8   Chapter 11 was precipitated by a dispute with Millenium.

9   Ultimately, a settlement was reached.

10           I would like to address, briefly, that there were

11  these allegations about serial filings and the like.  In

12  sitting down with my clients, it was obvious that they -- it

13  took them a while to find what I would consider to be

14  competent bankruptcy counsel because the first three filings

15  were done by someone who does not practice on a regular basis.

16  One of them was dismissed one day later.  Another was

17  dismissed six months later, I think after they accomplished a

18  particular goal.  And the third one was also dismissed in six

19  weeks or something like that.

20           So the first real bankruptcy was the one that

21  Mr. Goldberg filed which is the case that we are in today.

22  And I -- so first of all, I don't think it is really relevant.

23  You know, lots of people file multiple times and the like.

24  But the history of this one is not as bad as Ms. Stevens would

25  have made it sound because -- and these were not real cases.

1   It was an attorney who, apparently, didn't know what he was

2   doing.  I mean, we don't usually file 11's on a Monday and

3   dismiss them on a Tuesday, for example.  So I just thought I

4   would put that out there just to clear the record.

5           So we are here on a motion to modify the second

6   amended plan, which Your Honor confirmed on September 8th of

7   last year.  The role and provision was that MIG, who owns the

8   first senior lien on the property, if not paid on the first

9   anniversary of the effective date, the property shall be sold

10  at auction.  And the first anniversary would be October 24th,

11  which is why we filed the motion -- filed a motion shortening

12  time and are here today.

13          I would point out that under the plan, MIG -- their

14  claim would -- if paid off within 60 days of the effective

15  date, would be $2.9 million.  And then if it was paid off 60

16  days after that, it would be $3.1 million.  But today, it is

17  $3.35 million.  So compared to where it was when Your Honor

18  confirmed the plan, the principal has increased by 14 percent.

19  And also, they are entitled now to 12 percent interest.

20          You know, quite frankly -- I mean, maybe it was my

21  naivety in thinking that, gee, we want another six months to

22  be able to refinance their debt, they are getting 12 percent

23  interest in the meantime.  There is no bank in the United

24  States that comes anywhere close to that.  We are actually

25  doing them a favor.  In reading MIG's objection, I guess they

1    don't necessarily look at it that way.

2            Anyway, we are asking for six months to refinance.

3    We filed a certificate of service and I think all the notices

4    were done properly and the like.

5            What we plan to show with our witnesses is a couple

6    of things.  First of all, the efforts that have been done over

7    the last 12 months to move the property along, both on

8    refinancing and on development.

9            Second, we want to show the obstacles that were

10   thrown in their paths consisting, in part, of raising interest

11   rates, you know, on a, perhaps, monthly basis.  And then the

12   EagleBank situation that Mr. Lichtenstein is here to, sort of,

13   defend his client's honor on and the like.  Which it -- the

14   best you could say is it mucked up the land records.  And, you

15   know, while Mr. Lichtenstein and I, and Mr. Costella, at

16   least, we can parse through it and figure out, okay, there was

17   some stuff that you wouldn't want to see there, but it is sort

18   of no harm, no foul.

19           But bankers are not -- it is not quite the same with

20   bankers.  And you will hear from the testimony that, you know,

21   when bankers see a million-dollar obligation that was not

22   included on the financial reporting for my clients, then all

23   of a sudden they go, well, we don't need to make this one.

24           So I think Mr. Lichtenstein complained that our

25   allegations in the motion were speculative.  And I agree with

1   that.  But we now have testimony that is going to match that

2   as to the obstacles created by that.

3         Eagle takes no position on the relief being sought

4   here.  Mr. Lichtenstein wants to protect the record.  There is

5   a pending adversary against them so I will say no more about

6   them.

7         Just a reminder, Your Honor, on the statutory

8   background.  Section 1127(b), post confirmation, modification

9   is provided that the plan has not been substantially

10  consummated.  And the two objection filed by the U.S. Trustee

11  and MIG take the position that it has been substantially

12  consummated.  We will show, and I will cite some to cases here

13  that the cases that the U.S. Trustee is relying on -- well,

14  first of all, let me start by saying I put the objections side

15  by side.  And it reminded me of high school where somebody

16  copied off of someone else's test.  And I don't know who, but

17  the similarities in the two objections were remarkably

18  similar, but -- so I sort of can focus on the U.S. Trustee and

19  it really, I think, covers both.

20        The language in the statute, starting with the plain

21  meaning, you talk about transferring substantially all the

22  property proposed to be transferred.  There was a chart that

23  the U.S. Trustee submitted, which I think is some of the best

24  evidence that we have in this case.  Because when you look at

25  the chart -- well, you start out with a line administrative

1   expenses.  Well, none of them were paid post-confirmation.  I

2   mean, throughout ever Chapter 11 case there is interim

3   compensation and the like.  And to count that as some of the

4   money that has been disbursed post-confirmation, I think is

5   disingenuous, at best.

6          Then there were also payments to equity.  And you

7   will hear testimony from Ms. Norris that either the directions

8   in the U.S. Trustee's post-confirmation forms need reworking

9   or she just didn't understand it right.  But there is no --

10  the plan does not provide for any money to equity.  So I would

11  hope the U.S. Trustee would have called up and said like what

12  is this number?  Instead, they put it in a chart in their

13  objection.

14         The bottom line is testimony will be there was no

15  money paid to equity.  So you take out the admin claim, you

16  take out the equity, and what do we have?  In Burtonsville we

17  have one $325 payment.  And in the other case we have 27- --

18  excuse me -- $6,700.  So roughly $7,000 has been paid out of

19  5.5 million.  And the cases that we will look at require at

20  least a preponderance of the payments made in either by class

21  or dollar amount, and we are nowhere close to that.

22         There are other secured creditors.  The second lien

23  holder represented by Mr. Leavers who, I guess, either doesn't

24  oppose or doesn't take a position on it based in his papers.

25  And Montgomery County, which is not here, which has a third

1  lien position.  And there are unsecured creditors still to be

2  paid.

3           If the property is sold at action and we are denied

4  relief today, it is unclear to the extent to which secured

5  debt will be paid.  Presumably, may go get all their money

6  out.  They are owed 3.35 million plus interest.  And based on

7  the testimony you will hear, the properties were somewhere in

8  the nine or $10 million range, but that is, you know, as is

9  and if an auction is held, there will be all the entitlements

10  that have been earned and Montgomery County will be out the

11  window.  The engineering work is owned by the engineering firm

12  and that will be out the window.

13           So whoever would buy it at auction would be,

14  essentially, starting from scratch, which, not only creates

15  significant risk of a bad sale price and that the second and

16  third liens and the unsecured creditors are basically going to

17  get hammered on it, but also, you have to look at the citizens

18  of Montgomery County, too.  I mean this is -- the purpose of

19  the property is for senior housing that there is a shortage of

20  in Montgomery counties, especially in the Burtonsville area.

21  Ms. Norris can testify to that.

22           And if it is sold at auction and you lose all the

23  entitlements and the like, then if it is going to still be

24  senior housing, then all of a sudden it is three years, five

25  years, seven years down the road, which doesn't seem right to

1  the citizens of Montgomery County.

2          Let me address the objection.  The U.S. Trustee

3  filed an objection and the sole issue is substantial

4  consummation.  They rely on a case, In Re: Dam Road Mini

5  Storage, 156 B.R. 270.  This case is readily distinguishable.

6  The debtor had three years to refinance in that case and they

7  didn't do it.  And then they waited a year to even ask the

8  court for modification.  So it is four years and they weren't

9  able to refinance.

10          To me, it struck me as almost a -- you know, a

11  latches or, you know, sort of, result win or anything.  I

12  mean, they are certainly not a diligent debtor to wait a year

13  after their debt lapses and says, oh, yeah, by the way, now I

14  would like to modify the plan or the like.  But to compare

15  that to our situation is totally unfair.  You will hear

16  testimony that the Norris' have spent -- been working hard the

17  last 12 months.  They -- on the development side, they have

18  got things.  In terms of the entitlements, almost to the

19  finish line.  February would be the finish line.  And that

20  they probably talked to 50 lenders during that time.  And they

21  finally have letters of intent out there.  But they are -- you

22  know, we still have to get to the finish line.  We understand

23  that.  But they haven't been doing nothing.

24          You read the Dam Road Mini Storage and it sounds

25  like they were doing nothing.  I mean, four years and they

1   couldn't get refinancing done.

2           I would also point out that that opinion has two

3   full paragraphs of discussion.  The rest is sort just boiler

4   plate.  Yet actually, I think, supports us in some of their

5   language when it said the word "substantial" means more than

6   half way, more than a mere preponderance.  And as I told Your

7   Honor a few minutes ago, $7,000 paid out of 5.5 million.

8           There is an unreported case, In Re: Archway Homes.

9   It is also factually distinguishable there.  Four classes of

10  creditors were paid in full.  Here, four classes of creditors

11  have not been paid at all.  And the only class that have been

12  paid is a little bit to unsecured creditors in the two

13  different cases.

14          They reference in their case cite, Dean Hardwoods,

15  Inc., 431 B.R. 387, which states that each court must

16  determine whether payments have commenced under the plan.

17  Appling plain meaning, commencement doesn't mean beginning

18  payments to one creditor, but distribution of all or

19  substantially all.  So I think that case actually helps us.

20          And in our research -- and I am sure they choose to

21  ignore it -- there is a case called In Re: Litton -- L-i-t-t-

22  e-n -- o-n, excuse me.

23          THE COURT:  Could you spell that again?

24          MR. GROCHAL:  L-i-t-t-o-n.  222 B.R. 788,

25  Bankruptcy, Western District Virginia, affirmed by the

1    District Court.  They held the plan was not substantially

2    consummated.  One payment was made to Wachovia and no one

3    else.  And the reason that the court found it was not

4    substantially consummated -- I mean, that involved farming

5    business.  That there were unforeseen circumstances which

6    excused the delay in meeting deadlines under the plan.  In

7    that case, it was crops had blue mold disease and draught.

8    And cattle -- the price of cattle went markedly down in value.

9            So they found that it was a good faith request.  I

10   think Your Honor will hear the same tune here where, you know,

11   high interest rates made the money more expensive and actually

12   closed the bridge loan market for a period of time.  And you

13   will hear testimony about the impact that the EagleBank UCC

14   filing had on the efforts to get loans.

15           Your Honor, the testimony will be that when the

16   entitlement process is completed in February, the Debtor's

17   opinion is that the value of the property will increase by

18   roughly $1 million.  You will hear that the Debtor has

19   aggressively attempted to obtain a bridge loan and has finally

20   gotten letters of intent, has spoken to 50 lenders.

21           The bottom line, Your Honor, is this six-month

22   request should be a win/win for everybody.  Certainly, it

23   gives the Debtor time to get to the finish line.  It is even a

24   win/win for MIG, although they obviously, won't admit it.

25   Maybe they have an ulterior motive.  I don't know.  Because

1  they are getting 12 percent on a balance that is 14 percent

2  higher than it was on confirmation.

3        Second lien holder is being benefitted because if we

4  can get the refinance done, they will get paid in full.  If

5  there is an auction sale, who knows?  And Montgomery County

6  has benefitted, both, monetarily as the third secured

7  creditor, and also the people of Montgomery County by getting

8  more senior assisted living where they sorely need it.

9        So subject to our evidentiary support, Your Honor,

10  we think that there is ample grounds to do it.  We think that

11  the argument relying on a debtor that waited four years to do

12  it, it has got holes in it.  And we also think that the chart

13  that the U.S. Trustee provided, when you dig down on it,

14  really helps us rather than helping their argument.

15        And I will also say, Your Honor, I have a lot of

16  respect for the U.S. Trustee's Office.  I know that they have

17  an important role in many cases.  But have got to say I was

18  very surprised to see the U.S. Trustee align themselves with

19  one senior secured creditor to the potential prejudice and

20  detriment of every other party in the case.  I just don't see

21  that.  I usually see them looking out for the whole more here.

22  And therefore, I found it somewhat astonishingly to see that

23  they are basically -- either they are parroting the secured

24  creditor or vice versa.  And, you know, with a potential of an

25  auction where other creditors are being wiped out, it just

1    doesn't seem like that is the norm.  So thank you.

2              THE COURT:  Thank you, Mr. Grochal.

3              Who would like to be heard first from the objecting

4    parties?  Ms. Stevens?

5              MS. STEVENS:  Sure.

6              Good afternoon, Your Honor.  So, again, I think the

7    -- our position is stated in our papers and we will get into

8    closing argument when that time is ready.  But I do want to

9    clarify one thing that Mr. Grochal said.  The chart that is

10   provided in our opposition is not a chart that was prepared by

11   the U.S. Trustee.  Rather, that is a cut and paste from the

12   Debtor's post-confirmation reports that the Court can take

13   notice, were way past due.  When they were filed, it was only

14   filed six days before they filed this motion.  So we didn't

15   have the opportunity to follow up with them to ask some of the

16   questions.  And they are riddled with errors throughout the

17   entire post-confirmation reports.

18             Other than that, I don't have any further for the

19   opening.

20             THE COURT:  Thank you.

21             Mr. Kokolis.

22             MR. KOKOLIS:  Thank you, Your Honor.  Thomas Kokolis

23   on behalf of Millenium Investment Group, LLC.

24             Just to clarify a couple of points that were raised

25   in the opening by the Debtors' counsel.  There was an

1  indication that somehow the principle increased under the

2  agreed upon settlement between Millenium Investment Group and

3  the Debtors with respect to the settlement that gave rise to

4  the confirmed plan.  That is not actually how that -- how the

5  monetary portion of that settlement works.  There was an

6  established amount for the claim that was then discounted of

7  certain -- if it was paid off by certain points under an

8  accelerated timeline.  And that did not happen so the full

9  amount of the claim is actually due.  So there was never

10  really an increase.  There were discounted amounts that were

11  due along the way.

12          The -- another item that is completely

13  distinguishable is that the -- and we will reserve a lot of

14  this for closing argument, but with respect to the substantial

15  consummation argument, the distinguishing factor here is that

16  Millenium Investment Group, which is a creditor -- and again

17  creditor and debtor are bound to the terms of the confirmed

18  plan, it is a final order, it is *res judicata* with respect to

19  the provisions of the plan.

20          Millenium Investment Group was required under the

21  plan and under the settlement of the parties to take certain

22  actions on their own at the front end of the plan.  Namely,

23  granting general releases to the Debtors and the principals of

24  the Debtors, granting -- dismissing with prejudice a

25  foreclosure of both the Burtonsville property and the

1  ElderHome property, dismissing with prejudice the foreclosure

2  of the Norris' principal residence because it was secured by

3  an IDOT benefitting Millenium Investment Group, and releasing

4  an assignment of rents that was also recorded against that

5  principal residence.

6         All of those actions occurred.  MIG substantially

7  performed all of its obligations under the plan.  And now has

8  left itself relying to the detriment of the Debtors on a final

9  resolution here by October 24th of 2023.  They knew going into

10 the plan that there could be hurdles, there could be risks,

11 there could be delays with financing.  They knew that the

12 market could change, that interest rates could go up, that

13 inflation could impact financing.  All of that was considered.

14 All of that was negotiated and negotiated at length over

15 months as we were before Your Honor for status conferences

16 leading up to that final settlement agreement.

17         And Millenium conceded quite a bit.  Their claim was

18 over $4.4 million initially.  They reduced it significantly to

19 come to a compromise.  They gave up releases and securities

20 against principal residences and tied themselves to a sole

21 remedy of an auction of this property if it couldn't be

22 refinanced or sold from one year from the effective date.  So

23 MIG has relied to its detriment greatly under -- with respect

24 to the terms of this plan.

25         And from MIG's perspective, this is substantially

consummated.  Certain actions have occurred.  And the only

action that could occur with respect to substantial

consummation with respect to the Debtors is the sale or

refinance of this property.  And if we keep kicking the can

down the road for six months, three months, another year,

there is really no end to the ongoing extensions.  And that is

why this drop-dead date was put into the settlement agreement,

which is verbatim, included into the plan.

Millenium Investment Group can put on testimony

today if the Court prefers by way of a witness to talk about

the current commercial investment market, what that looks like

today, what it could potentially look like in six months.  And

then also, with respect to the current status of the

properties and how that would impact financing on the

commercial market.  But all of that, we can go into during

testimony.  And then I will save the majority of arguments for

closing.  Thank you.

MR. LEAVERS:  Good afternoon, Your Honor.  Our

response said that we weren't taking a position to the motion,

but we wanted to reserve our rights to do so if we needed to.

Prior to us filing a response, the Debtors and my client were

discussing non-monetary defaults under the agreement that they

have with my client.  I think we resolved that today before

the hearing.  I seek Counsel to confirm if that is going to be

cured.  I think it has been cured or it is going to be cured.

 1   And if so, then we won't be taking a position at today's

 2   hearing.

 3              THE COURT:  Okay.

 4              MR. COSTELLA:  Yes.  I don't dispute that.  We did

 5   resolve the issues that we had.

 6              THE COURT:  Okay.  The default that he is talking

 7   about has been cured?

 8              MR. COSTELLA:  It will be.  Yes.  We were just

 9   asking for -- and I apologize for looking at my phone during

10   it, but we were just confirming with his client that we were

11   going to do what they were asking us to do.  There was a few

12   issues that we had with it.  We ironed those out so it should

13   not be a problem.

14              THE COURT:  And those are non-monetary defaults?

15              MR. LEAVERS:  They are non-monetary defaults.  And

16   just for the record, specifically, the agreement that was

17   approved by this Court, paragraph 3.4, the agreement required

18   the Debtors to execute a promissory note upon the occurrence

19   of a particular event.  There are nine events, the earliest of

20   which was August 31, 2023.  And that time came and went and

21   the promissory note wasn't executed.  And I think it was just

22   due to maybe some confusion on the part of the Debtors, but

23   again, we met just before the hearing and we were assured that

24   the promissory note was going to be executed.

25              THE COURT:  So your client is not taking a position

1    with regard to the requested extension?

2              MR. LEAVERS:  With respect to the request extension,

3    we are not going to take a position.

4              THE COURT:  Thank you.

5              MR. LEAVERS:  Thank you.

6              Mr. Lichtenstein, would you like to be heard in

7    opening statements?

8              MR. LICHTENSTEIN:  No, Your Honor.  Thank you.

9              THE COURT:  All right.  Thank you.

10             All right, so Mr. Grochal, you may call your first

11   witness.

12             MR. GROCHAL:  Your Honor, I would like to call

13   Mr. Tom Norris.

14             THE COURT:  So, Mr. Norris, if you would stand at

15   the opening to the witness box.  Ms. Whitfield will administer

16   the oath.

17             THE CLERK:  Please raise your right hand.

18   Whereupon,

19                         THOMAS NORRIS

20   was called as a witness by The Debtor, having been first duly

21   sworn, was examined and testified as follows:

22             THE CLERK:  Okay.  Please be seated.  And speak into

23   the microphone.  Please state your name and address for the

24   record.

25             THE WITNESS:  Thomas Norris, 15623 Riding Stable

1  Road, Burtonsville, Maryland.

2          THE COURT:  And, Mr. Norris, you can pull that

3  microphone down a little bit so we can hear you better.

4          THE WITNESS:  Okay.

5          THE COURT:  That might be a little bit too much.

6  There you go.

7                      DIRECT EXAMINATION

8      BY MR. GROCHAL:

9  Q    Okay.  Good afternoon, Mr. Norris.  Can you just briefly

10  describe the Debtors' primary business purpose?

11  A    We are primarily a senior housing developers.  And also,

12  we are developing some work force housing.

13  Q    Okay.  In Montgomery County?

14  A    In Montgomery County, yes.

15  Q    And what is your capacity with the Debtors?

16  A    I am the president and the co-owner of the properties.

17  Q    And as president and co-owner, what are your primary

18  duties and responsibility?

19  A    My primary duties are the development or -- and I have to

20  deal with the county about zoning.  I have to deal with the

21  conditional use permit for both projects.  And so I end up

22  dealing with all the issues from traffic studies to

23  engineering storm water management, et cetera.  It's a pretty

24  complex operation.

25  Q    Okay.  I assume you are aware that the plan was confirmed

1   in September and the effective date was October 24th of last

2   year and that you had one year to refinance the debt.

3   A     Yes, sir.

4   Q     Okay.  And what steps have you taken to refinance the

5   secured debt on the real property since confirmation?

6   A     We have worked tirelessly with -- I've met over 50

7   lenders -- well over 50 lenders and helped them with due

8   diligence and did a lot of that financing.  I met with joint

9   venture partners.  Met with Berkadia.  So it's a lot of

10  meetings with financing people and joint venture partners.

11  Things like that.

12  Q     And you have a construction loan but you are looking for

13  a bridge loan, is that correct?

14  A     Yes.  Yes.

15  Q     What obstacles have arisen over the past 12 months to

16  make obtaining the bridge loan more difficult?

17  A     Well, the first six months was the financial crisis, the

18  feds kept raising the interest rate -- I don't know -- a dozen

19  times or something.  It was historical the way they did it so

20  quickly.  And it caused bank failures and it frightened a lot

21  of the lenders and the bridge lending industry just shut down.

22  They just closed the door in anybody's face.  They were not

23  giving bridge loans for the first six months of that 12-month

24  period.

25              After the fed stopped -- finally stops -- slowed

1    down -- some bridge lenders opened back up and we were working

2    diligently with them to take care of, you know, getting the

3    bridge loan.  And as we were working some progress there, we

4    had some other issues that we never saw coming.  Eagle had

5    filed some false UCC filings that -- the lenders kept asking

6    about EagleBank and we would tell them that they're paid off

7    and we don't owe them any money.  And they weren't believing

8    us.

9          And finally, we figured out -- I think, so they --

10   someone actually told us that, Tom, here's millions of dollars

11   of UCC filings on both of these properties from EagleBank and

12   you're telling us that it's paid off.  And lenders don't like

13   that.  They don't want to get their lawyers involved and they

14   -- it caused a lot of problems.

15         As it was, you have to explain to the lenders every

16   detail of your bankruptcy.  They want to know, you have to

17   tell them.  And so they were thinking like, well, maybe we're

18   not telling the story right because why are these bank --

19   these filings here?  So we --

20   Q    Mr. Norris, is it fair to say that you were not aware of

21   what EagleBank had filed in the land records until the bankers

22   brought it to your attention?

23   A    Correct.  We had no idea.  Never dreamed of such a thing

24   because we had paid them off some five years earlier.  So

25   we're stunned when we finally saw it.

1  Q    Okay.  One of the issues is -- going forward, why are

2  things going to be different?  Can you report on what your

3  understanding of the status of the land records filings are?

4  A    Well, I think some of it got cleaned up.  Of course, we

5  told our lawyer, Richard Simmons.  And so we have some -- a

6  paper trail that we can now share with the lenders and say,

7  look, this was a mistake.  It wasn't -- it's not true and what

8  we were telling you is correct.  So we can say that now.  So

9  that's one roadblock that's out of the way.

10          The market is also -- the bridge lending market has

11  recovered.

12  Q    Okay.  In addition to the refinancing efforts, on the

13  development side, what have you done and accomplished over the

14  past 12 months?

15  A    We have been working tirelessly with Montgomery County,

16  with the various engineers to develop the property.  There is

17  a very long list -- complicated list of things that must be

18  submitted to the county, soil borings, and traffic studies,

19  and just a long list of dozens of items.  And we are working

20  through those and we are 90 percent through.  The county has

21  accepted a design of the building, and a number of parking

22  spaces, and the number of beds.  So we're 90 percent through

23  this administrative process with Montgomery County.

24  Q    And when do you estimate the timeline to be to complete

25  the process?

1  A    Had we not -- if we had financed it, it would have been

2  done already.  But -- so we've had to stop until we get

3  refinancing.  Our date is set for February, the final --

4  crossing the finish line for the entitlement.  Which makes the

5  lenders more anxious, eager to fund.

6  Q    And what impact do you believe that will have on the

7  value of the property?

8  A    The impact of that is about a million dollars as-is

9  appraisal.  Without that entitlement is about $9 million, 9.2

10  million.  And when it crosses the finish line, it's 10.2

11  million.  So we've increase the property almost a million

12  dollars with the work that we've done.

13  Q    How did you pay for the development work that has been

14  done over the past 12 months?

15  A    Cetera was helpful in that.  So we had funds from Cetera.

16  After that, we put our money in to keep moving things forward.

17  Q    Okay.  You just gave your opinion as to as-in and, you

18  know completed value.  Can you just explain your experience in

19  the real estate industry, please?

20  A    I've been in the real estate industry for at least 40

21  years as a developer and builder.  I've been working with the

22  senior housing industry for the last ten years, at least.  So

23  I've seen lots of projects, lots of analysis of what they're

24  worth, what they're valued, what they cost.

25  Q    What is the status of the Burtonsville property?

1    A    The Burtonsville Crossing is under a letter of intent to

2    a workforce housing company that -- a large one, rather.  And

3    after the talked with Montgomery County, Montgomery County

4    said that they would change the zoning for them because they

5    need workforce housing.  And so that's been -- that's going

6    under contract for workforce housing.

7    Q    Okay.  The value of the property, you testified, is

8    somewhere between 9 and 10 million.  What is the amount of the

9    secured debt that the Debtors have today?

10   A    About 5 million.

11   Q    Okay.  So is it fair to say that there is ample equity in

12   the property?

13   A    Yes, sir.

14   Q    Do you believe that, if given an additional six months,

15   that the Debtors will be able to obtain bridle loan financing?

16   A    Yes.  Yes, I do.

17   Q    Do you currently have any letters of intent?

18   A    For the senior housing?

19   Q    Yes.

20   A    Yes.

21   Q    And would it be sufficient dollars to pay off all the

22   secured debt?

23   A    Yes.

24   Q    And would it be able to close in the next 60 days or

25   less, potentially?

1   A     I believe so.

2   Q     Okay.

3         MR. GROCHAL:  I have no further questions, Your

4   Honor.

5         THE COURT:  Thank you.

6         Cross examination, Ms. Stevens?

7                     CROSS EXAMINATION

8   BY MS. STEVENS:

9   Q     Good afternoon, Mr. Norris.  My name is Lisa Stevens.  I

10  am a trial attorney with the Office of the United States

11  Trustee.

12        Just a few questions to ask you.  You said that you

13  have been in the developing business for 40 years, is that

14  correct?

15  A     Yes, ma'am.

16  Q     And during that time, I am assuming as part of your

17  development business, you have reached out to lenders to

18  finance your projects; correct?

19  A     That's part of the business, yes.

20  Q     Right.  So would you say that you are fairly familiar

21  with the financial markets?

22  A     I'm familiar with them.  They move up and down, so I

23  don't --

24  Q     Right.  So you know that in your experience the markets

25  tend to ebb and flow; correct?

1    A    Everything ebbs and flows.

2    Q    Right.  So a year ago when you were working with

3    competent counsel in this case and you negotiated the

4    settlement with Millenium, you knew that the markets could go

5    up or the markets could go down; correct?

6    A    Of course.  What I never knew -- and, apparently, neither

7    did a lot of other people, that the feds would raise the

8    interest rates so dramatically within a very short period.  It

9    was historical.  It was a historic thing.  To this day, it's

10   been -- so I didn't -- if I had known that that crisis was

11   around the corner, we would have negotiated differently, tried

12   to put a clause in saying, hey, if this thing is going to blow

13   up -- but no, I did not anticipate that and I'm not sure I've

14   met anyone or heard of anyone that anticipated what the

15   Federal Reserve did.

16   Q    What did you expect to do with that one year?

17   A    Get a bridge loan, refinance it, and push the project

18   forward.  That was the plan.

19   Q    Okay.  So --

20   A    It's still the plan.

21   Q    -- one of the things that you said that there was an

22   issue -- and, again, I am not familiar with the Eagle UCCs.  I

23   am just relying on what was in the pleadings filed by your

24   counsel -- that it looks like that the continuation sheet for

25   the UCC for EagleBank was filed June 13th of 2023, is that

 1  correct?

 2  A    I think it was somewhere around that.  Yes.

 3  Q    Okay.

 4  A    Or some of them.  There may have been other ones before

 5  that, so I don't -- I'm not sure which ones you're talking

 6  about.  But the latest ones, that sounds like the right date.

 7  Q    Well, it says the Debtors -- it says, "Knowingly and

 8  intentionally filed UCC continuation statements against both

 9  of the Debtors on June 13, 2023."  Is that your understanding?

10  A    Yes.  In fact, that was a few weeks after a mediation

11  that we had had with EagleBank.

12  Q    Okay.  So, again, your understanding is that it was June

13  13th.  And then -- and the documents that were filed by

14  EagleBank, it looks like those UCCs were released on August

15  8th of 2023.  Is that your understanding as well?

16  A    I'm not -- I wasn't involved in looking --

17  Q    Okay.

18  A    -- one way or another, so --

19  Q    So that was just, at most, two months during the last

20  year that there could be this potential, as you referred to

21  it, cloud on the title.  Is that true?

22  A    Yes.  Yes.  Yes.

23  Q    Okay.  And, Mr. Norris, you are familiar with the second

24  amended joint plan of reorganization that was approved by the

25  Court; correct?

1   A    I'm not sure I'm that familiar with it.  I'd have to see

2   it.

3   Q    Well, aren't you the representative that authorized the

4   plan to be filed and confirmed with the Court?

5   A    Well, I'm sure I did, but that was a year ago.  So I'm --

6            MR. GROCHAL:  Your Honor, I would object.  Beyond

7   the scope of direct.  I didn't ask anything about the plan.

8            THE COURT:  Overruled.  We are here on modification

9   of a plan.  And the direct testimony related to the reasons in

10  support of modification.  So I think it is fair game to talk

11  about the plan.  You may continue.

12       BY MS. STEVENS:

13  Q    So, Norris, one of the provisions of the plan said that

14  on the effective date, MIG was going to release its liens

15  against all non-debtor assets and release its claims against

16  all non-debtor related parties of the debtor.  Are you

17  familiar with that provision?

18  A    Yes.  Yes.

19  Q    And did that occur?

20  A    Yes.

21  Q    And you are one of the related parties that had a lien

22  that was -- you were the beneficiary of one of those lien

23  releases.

24  A    Yes.  They were over-collateralized, so --

25           MS. STEVENS:  Your Honor, can I grab something from

1   my desk?

2           THE COURT:  You may.

3       BY MS. STEVENS:

4   Q    And with respect to Burtondale (sic), it had one general

5   unsecured creditor; correct?

6   A    I don't know.  It was extra collateral, so I don't

7   know --

8   Q    No, I am talking about in your bankruptcy case.  There

9   was one general unsecured claim of Burtonsville.

10  A    Okay.  Whatever.  Yes.  If that's what it is.  I don't

11  know.  I would have to see the documents.  I don't remember

12  all these documents, what they say and --

13  Q    So you don't know what you are to be paid -- what the

14  Debtors are to be paying under the plan?  Is that what you are

15  testifying to?

16  A    I am testifying I don't understand your question.  I need

17  some paperwork if I'm going to try to recite documents from

18  memory.  I don't want to do that.

19  Q    Do you know if payments were made by either ElderHome or

20  Burtonsville within the last 12 months pursuant to its

21  obligations under the plan?

22  A    I would defer to Liz.  I'm not in that department.

23  Q    And, I am sorry, you did say that you have letters of

24  intent.  Could you let us know what the parties are that you

25  have those with?

1          MR. GROCHAL:  I would object, Your Honor.  The

2     letter of intent had a confidentiality provision.  We are not

3     allowed to share the name of the lender or the terms.

4          MS. STEVENS:  That is fine, Your Honor.  I will ask

5     a different question.

6          THE COURT:  Okay.

7        BY MS. STEVENS:

8     Q    The lender with which you have a letter of intent, when

9     was the letter of intent executed?

10    A    I believe one letter of intent was September.  Very --

11    rather recently.  I thought it was September 23, but I

12    don't --

13    Q    Were you in discussions with that lender prior to the

14    lender of intent being executed?

15    A    Yes.

16    Q    How long prior to the letter of intent being executed

17    were you in discussions with that lender?

18    A    This one lender that I'm talking about, I've been in

19    discussions with them for the last eight months, nine months.

20         MS. STEVENS:  No further questions, Your Honor.

21         THE COURT:  Thank you, Ms. Stevens.

22         Mr. Kokolis.

23                        CROSS EXAMINATION

24       BY MR. KOKOLIS:

25    Q    Good afternoon, Mr. Norris.

1   A    Good afternoon.

2   Q    I am Thomas Kokolis, attorney for Millenium Investment

3   Group.  You stated you have been involved in real estate for

4   was it 40 years?

5   A    Forty years.  I'm old.

6   Q    Okay.  And through that time you have seen market changes

7   and shifts from the modest to the extravagant, isn't that

8   true?

9   A    Yeah.  Over the years that happens occasionally.

10  Q    Okay.

11  A    Although, I've never seen the fed do what they did.  I've

12  never seen them jack the rates up like they did.  It just was

13  an amazing thing.  And everyone was afraid.  They didn't know

14  when they were going to stop.  That was the issue.  So I've

15  never seen that before, but --

16  Q    So it's fair to say that you were involved in the real

17  estate world in, say, 2006 to 2010?

18  A    Yes.

19  Q    Okay.  And have you ever seen a situation as what

20  happened in that -- during that time period where the market

21  collapsed?

22  A    That was a different reason, but yes.

23  Q    But it was historic, wasn't it?

24  A    Yes.  Yes.

25  Q    Yes.  So you knew that historic events could impact your

 1  ability to obtain financing?

 2  A    Well, I think anyone knows that historic events can

 3  impact anything.

 4  Q    Sure.

 5  A    That's just the general saying, but did I suspect that

 6  that was going to take place?  Absolutely, I did not.  I

 7  watched the financial shows all the time and all the talking

 8  heads and what the experts think and I don't think one of them

 9  saw that coming.

10  Q    The -- you had mentioned that you had hurdles in

11  obtaining financing and you eluded to the EagleBank UCC

12  statements.  But isn't it possible that there are other

13  reasons why financing wasn't provided?

14  A    The first six months, the reason was that the -- they

15  were shut down.  The feds were doing -- taking such action

16  that the lenders didn't want to lend.  So absolutely, the

17  first six months, nobody was interested in lending until they

18  understood what was happening with the Federal Reserve.

19           After that happened, about the second six months, it

20  did make a difference.  And in fact, the -- I think there was

21  some stuff on there even before the June 13th recent one.  I

22  think there was some extra stuff on there all along in the UCC

23  that we weren't aware of.  And maybe Liz knows -- I think Liz

24  knows more about that than I do.

25           So the second -- you know, we could have gotten this

 1  thing financed during the second months because we had been

 2  working so hard and we had a number of lenders that were

 3  discussing things with us.  But when that UCC stuff happened,

 4  the lenders could not go forward.  They just couldn't -- they

 5  could not legally talk about lending us money on these

 6  properties when the bank is claiming that they are owed

 7  millions of dollars.  It wasn't just one million, it was 1.4

 8  million on each property.  I mean, it was like 3 million

 9  total.

10          And they just couldn't wrap their heads around we're

11  going to give you a loan, but yet the -- on the record, the

12  bank is saying that you owe millions.  And yet, Tom, you're

13  saying you paid them off and you're still in bankruptcy.  And

14  they just -- it's just too much confusion.  They just can't

15  handle that.  They're not lawyers.  They're bankers.

16  Q    You don't think filing eight bankruptcies and suing your

17  lenders had any impact on --

18  A    Absolutely none.

19  Q    None?

20  A    Absolutely none.

21  Q    You sued multiple lenders in the past, isn't that true?

22  A    I'm a developer.  I've been in this business for 40

23  years.  So, yeah, I've had some bad lenders.  And your client,

24  MIG, was a very bad lender.

25  Q    Was EagleBank a bad lender?

1   A    Absolutely.  In fact, I think there's an adversarial case

2   in this court, if you doubt me.

3   Q    Have you complied with all the terms of the plan up to

4   date?

5   A    I think we have.  We tried to.

6   Q    You haven't provided any post-quarterly reports with

7   evidence of your entitlement and permitting process during the

8   last 12 months, have you?

9   A    I don't know if that's requested.  I'm happy to do it.  I

10  can do that, so --

11  Q    Oh, you were obligated to do it under the plan.  You

12  didn't do it, did you?

13  A    I don't -- it's not my department, so if someone wants me

14  to do it, I'll do it.

15  Q    Is that because the entitlements haven't been -- there

16  has been no advances made in the entitlements in the last 12-

17  months?

18  A    Oh, absolutely not.  We've had tremendous advances with

19  the county.  If you looked up this project on the county's

20  computer right now, you will see it.  You will see that it's

21  been accepted.  You'll see all the things that's happened to

22  it.  We have a development attorney and you're welcome to talk

23  to the development attorney and get her read on how much we've

24  done because she had to be there every step of the way, as you

25  go through this process.  So it's very easy to show what we've

1   done, and how we've done it, and the value that it's added to

2   the project.

3   Q    And you would argue -- and you have already stated you

4   received significant benefits as a result of the settlement

5   with MIG, isn't that true?

6   A    I don't know about that.  I don't -- what benefits so

7   far?  I mean, the benefits, I'm trying to save the project.

8   So --

9   Q    You are no longer personally liable, isn't that correct?

10  A    Well, and -- that's fine.  When you over-collateralize,

11  what's the point?

12  Q    Your principal residence is no longer encumbered, isn't

13  that true?

14  A    That's correct.

15  Q    Foreclosures have been dismissed, isn't that true?

16  A    MIG is sitting on $12 million of equity for a $3 million

17  payoff.  Why do you need 20 million?  Or why do you need more

18  than 12 million in collateral?

19  Q    I don't think there is any concrete evidence before the

20  Court with those evaluations.

21          MR. KOKOLIS:  I have no further questions, Your

22  Honor.

23          THE COURT:  Thank you, Mr. Kokolis.

24          Anyone else want to cross examine this witness?

25          Mr. Lichtenstein?

1          MR. LICHTENSTEIN:  Yes, Your Honor.  I have a few

2     questions.

3                        CROSS EXAMIANTION

4          BY MR. LICHTENSTEIN:

5     Q    Michael Lichtenstein for EagleBank Commercial Bank,

6     EagleBank.

7          Mr. Norris, have you ever seen a UCC1 financing

8     statement?

9     A    Probably.  I'm sure I have.

10    Q    Do you know if that UCC1 financing statement states the

11    amount of debt owed to a lender?

12    A    I do not.  I'm not an expert on UCC.

13    Q    Okay.  Well, assuming that it doesn't, which it doesn't.

14    In fact, since you say you have seen them, how did these

15    lenders know that millions of dollars was allegedly owed to

16    EagleBank?

17    A    That's what I wanted to find out.  Until one of them, I

18    think, actually told us, on your UCC it says XYZ.  It says you

19    owe this money.  That's how we found out about it.  From the

20    lender.  So you need to ask the lenders why they have a

21    problem with it.

22    Q    They told you --

23    A    Not me.

24    Q    Your testimony is that the lender told you that you owed

25    this --

 1  A     That's how we found out.  Lenders -- a lender called our

 2  office.

 3  Q     Excuse me.  Can I just finish my question before you

 4  answer, please?

 5  A     Sure.

 6  Q     Thank you.

 7        A lender told you that you owe a certain amount of

 8  money to EagleBank based upon the UCCs that they saw?

 9  A     The lender says we doubt your story.  EagleBank is

10  claiming you haven't paid them off.  That's what they said.

11  And then our office is going like, well, that's not true.  And

12  they're saying like -- and then one of them told -- I think

13  they told Liz, you need to check your UCC.  And that's when

14  she checked it and all of a sudden, it's like here's all this

15  stuff on there.  And then, of course, we told, you know,

16  Roger, our lawyer about it and he told you about it.

17        So I'm not a UCC expert.  So all I know is the

18  lenders were freaked out when they saw this.

19  Q     Could you tell me the name of the lender that raised the

20  UCC1 issue?

21  A     I don't recall, but I can find out if you need -- if it's

22  that important to you.

23  Q     Well, it is important to me because you are testifying at

24  the hearing right now.

25  A     Okay, well, I don't have my rolodex in here.  I've talked

1  to hundreds of lenders.  It was up in New York and -- anyway,

2  a couple of them have said that.  It wasn't just one.  It was

3  a couple of them, so if that's important, I can get that for

4  you, but not out of my memory.

5  Q    Yes.  It is important, so could you tell me as you sit

6  here today and testify the name of any lender that raised the

7  UCC1 issue?

8  A    I think Jim Boris of Berkadia would be one.

9  Q    I am sorry, could -- how --

10 A    Jim Boris.  Jim Boris of Berkadia.

11 Q    How do you spell Berkadia?

12 A    B-e-r-k-a-d-i-a.  They're a lender.  And there's some

13 others as well, but that's one that comes to my mind.

14 Q    Where is Berkadia Lender?  Is that a Maryland lender?

15 A    Well, Berkadia is a national lender.  And Jim Boris'

16 office is in, I think, Chicago or Wisconsin.

17 Q    Do you know if Berkadia is authorized to do business in

18 Maryland?

19 A    I'm sure Berkadia is.

20 Q    You are -- why are you sure of that?

21 A    Well, because I've been talking with him and they've

22 given me, you know, an LOI and they said the can do it.  So

23 have I personally examined their credentials in Maryland, I

24 have not.

25 Q    Did I understand that they have given you a letter of

1  intent?

2  A     They have.

3  Q     And when did they do that?

4  A     They've given us a number of them.  And most recent one

5  was about -- in September.

6  Q     And what is the amount of the letter of intent?

7  A     Oh, I think this was like $40 million.  Something like

8  that.

9  Q     You have a letter of intent from Berkadia for $40

10  million?  Is that your testimony?

11  A     Yes.  It's for the construction loan.  It's not just the

12  bridge.  It's for the bridge and the construction loan for the

13  whole project.  This is a $65 million project.

14  Q     You are aware, are you not, that your wife filed

15  termination statements -- UCC statements for the Eagle --

16  excuse me.  Let me just finish my question.

17          You are aware, are you not, that your wife filed

18  UCC3 termination statements for Eagle Commercial Ventures in

19  2021?  Are you not?

20          MR. GROCHAL:  Your Honor, I would object at this

21  point.  Aside from the fact it is well beyond the scope of

22  what I asked him.  Ms. Norris is going to testify.  So to ask

23  him what his wife did seemed to be pointless at this juncture.

24          THE COURT:  Objection is overruled.  The Court will

25  allow him to testify regarding his personal knowledge.  We did

1  cover the EagleBank UCC ones in prior testimony.

2            THE WITNESS:  I am not aware of the details.  That's

3  her department, so I'm -- like I said, I'm not a UCC expert.

4        BY MR. LICHTENSTEIN:

5  Q    Any of these lenders who raised an issue about the

6  EagleBank lien, did you have them contact EagleBank?

7  A    They don't want to contact EagleBank.  That's the last

8  thing they want to do, is start contacting, getting into a

9  legal battle.  So that's not a normal thing any lender would

10  do.  And they don't want to do it.

11  Q    Mr. Norris, my question was did you ask any of these

12  lenders -- did any of them talk to -- contact EagleBank to

13  figure this out?  Did you have a discussion about that?

14  A    I don't know if they've talked to EagleBank.  I don't

15  know that.

16            MR. LICHTENSTEIN:  Nothing further, Your Honor.

17            THE COURT:  Thank you.  Any other cross examination?

18        (No verbal response.)

19            THE COURT:  Before we do redirect, the Court does

20  have a few questions for Mr. Norris.  Mr. Norris, you

21  testified earlier about what you believe the as-is value of

22  the property is.  Would you give me that number again?

23            THE WITNESS:  Nine million, two hundred thousand, I

24  believe.

25            THE COURT:  And the value that you expect it to be

1    after the entitlement process is completed?

2             THE WITNESS:  It was 10,200.

3             THE COURT:  Ten million?

4             THE WITNESS:  Ten million.  I'm sorry.  Ten million,

5    two hundred.

6             THE COURT:  Okay.

7             THE WITNESS:  And this is coming from an appraisal

8    that was presented to the Court some time ago and was accepted

9    by the Court and no one objected to it, so --

10            THE COURT:  And how many letters of intent do you

11   currently have that have not expired and are still viable?

12            THE WITNESS:  I have two.

13            THE COURT:  And are they both for both the

14   construction loan and the bridge loan?

15            THE WITNESS:  One is for just the construction loan

16   and the pace loan.  The other one is for the bridge loan and

17   all of the construction loan.

18            THE COURT:  And what is the amount of the first one?

19            THE WITNESS:  The first one is like -- oh, wow -- 45

20   million.  Something like that from Berkadia.

21            The second one I have is like 66 million because

22   it's all the construction, all of the bridge.  It's

23   everything.  Obviously, I can't take them both so we have to

24   figure out which one we can take.  And there's others we're

25   working with, so I don't want to say these are the only two.

1   These are the only two we have in writing today and we're

2   trying to get a few more and get this done.

3            THE COURT:  Okay.  And you testified earlier when

4   you were talking about the letter of intent with Berkadia,

5   that it is a -- you said it is a $65 million project.  Do you

6   mean after completion of development?

7            THE WITNESS:  The cost is 65 million.  The land, and

8   the construction, and FF&E and everything, soup to nuts as a

9   -- escrow is probably $8 million of required escrows.  And

10  that is also a part of the $65-million project cost.

11           THE COURT:  Do you know if there have been any

12  distributions to you and/or Ms. Norris from either ElderHome

13  or Burtonsville Crossing since the plan was confirmed?

14           THE WITNESS:  I don't know.  It's not my department.

15  I don't think so, but you can ask Liz.  She's the record

16  keeper.

17           THE COURT:  Thank you.

18           Mr. Grochal.

19                       REDIRECT EXAMINATION

20       MR. GROCHAL:

21  Q    Mr. Norris, the Court asked you a value and you were

22  referencing an appraisal.  Is it your testimony that you rely

23  on your experience and the like, except the appraiser's

24  opinion of value as-is and completed?

25  A    Yes, sir.

1    Q    Did you ever do business with EagleBank?

2    A    Yes, sir.

3    Q    Or did you do business with Eagle Ventures?

4    A    Yes, sir.  Both.

5    Q    Okay.  In 2023 EagleBank filed a continuation statement I

6    think in August of 2023.  Is any money owed to either Eagle

7    Ventures or EagleBank at that time?

8              MR. LICHTENSTEIN:  Your Honor, I object to --

9              THE WITNESS:  No.

10             MR. LICHTENSTEIN:  -- a mischaracterization of the

11   facts as we have set forth in our pleadings as misstating the

12   facts.  EagleBank did not file a statement.

13             THE COURT:  Re-ask your question, Mr. Grochal.

14             MR. GROCHAL:  Okay.

15        BY MR. GROCHAL:

16   Q    There was a continuation statement filed by -- in the

17   name of EagleBank that referenced the loan number for the

18   Eagle Ventures loan.  Were you aware of that?

19   A    I was informed of that.  Yes.

20   Q    Okay.  And to your knowledge, is that continuation

21   statement still out there despite the fact that you have

22   gotten releases on everything?

23   A    I think it is.  I think it's still out there.

24   Q    Okay.  And has that caused problems for you in speaking

25   with various lenders?

1  A    It always causes problems.  They don't like it when you

2  have -- someone is telling a bank saying you owe them millions

3  of dollars and you're not, you know, saying that to the

4  lender.

5  Q    Mr. Kokolis asked you about various development

6  documents.  Are you aware of the fact that you authorized

7  counsel to provide Mr. Kokolis and his client with various

8  requested loan documents?

9  A    I believe so, yes.

10  Q    And to your knowledge, were those, in fact, provided?

11  A    Yes.

12  Q    Mr. Kokolis asked you at length about various releases

13  and the like.  Isn't it correct that those were all part of a

14  global settlement reached between MIG and the Debtors?

15  A    Yes, sir.

16  Q    And as part of that settlement, MIG is now accruing 12

17  percent interest on their unpaid balance, is that correct?

18  A    That's correct.

19           MR. GROCHAL:  I have nothing further, Your Honor.

20           THE COURT:  Any recross?

21           MR. LICHTENSTEIN:  I have a couple of questions.

22           THE COURT:  You may proceed.

23                     CROSS EXAMINATION

24      BY MR. LICHTENSTEIN:

25  Q    Mr. Norris, you just testified that you believe that the

1  continuation of UCC statements are out there.  You recall

2  telling -- stating that?

3  A     That what?

4  Q     That the continuation statements are still out there.

5  A     Yes.

6  Q     What's the basis for your saying that?

7  A     I thought someone showed that to me.

8  Q     Well, did anybody show you the statement -- the

9  termination statements that were filed once your counsel

10 contacted EagleBank?

11 A     Like I say, I'm not the UCC guy, so --

12 Q     I'm not asking if you are a UCC guy.  I am asking you if

13 you have been shown the termination statements that were filed

14 in August?

15 A     I do not recall.  I don't recall.

16            MR. LICHTENSTEIN:  Nothing further.

17            THE COURT:  Any other questions for Mr. Norris?

18       (No verbal response.)

19            THE COURT:  Mr. Norris, thank you for your

20 testimony.

21            THE WITNESS:  Thank you.

22            THE COURT:  You may return to your seat.

23       (Witness excused.)

24            THE COURT:  Mr. Grochal, you may call your next

25 witness.

1          MR. GROCHAL:  I would call Liz Norris.

2          THE CLERK:  Please raise your right hand.

3   Whereupon,

4                        ELIZABETH NORRIS

5   was called as a witness by The Debtors, having been first duly

6   sworn, was examined and testified as follows:

7          THE CLERK:  Please be seated and state your name and

8   address for the record into the microphone.

9          THE WITNESS:  Elizabeth Norris, 15623 Riding Stable

10  Road, Laurel, Maryland.

11         THE COURT:  You may proceed.

12                      DIRECT EXAMINATION

13     BY MR. GROCHAL:

14  Q    Ms. Norris, what is your official capacity with the

15  Debtor?

16  A    I'm a co-manager, and part owner, and vice president.

17  Q    And in your capacity as co-manager, what are the duties

18  that you have been responsible for?

19  A    Pretty much the administrative duties.  Anything from

20  accounting to cash flows.  But also working with the lenders

21  and doing proformas for the new facility, working with the

22  community, the neighbors.  It's a lot of different things.

23  Q    And have you been involved in the post-confirmation

24  efforts to refinance the secured debt?

25  A    Yes.

1  Q    How many lenders did you speak to or reach out to during

2  the last 12 months?

3  A    Over 50.

4  Q    Okay.  What types of issues and impediments arose in

5  those discussions?

6  A    Well, originally, as Tom was saying, the market was very

7  bad.  The fed -- since July of 2022, they raised the rates 11

8  times.  And they did it so quickly initially that everybody

9  thought we were going to end up in a recession.  And we ended

10  up not in a recession, which is good for us now because the

11  market's getting better.

12            And then also the EagleBank UCC filing.

13  Q    With respect to the interest rate increase, was there a

14  period of time where the market for bridge loans was totally

15  closed?

16  A    Yes.

17  Q    About how long did that last?

18  A    The first six months -- when they raised it in July,

19  people were kind of concerned.  By September, they didn't know

20  what was going to go on.  So they essentially just stopped

21  through the early spring.

22  Q    And how about today?  Is there a market for bridge loans?

23  A    Today it's gotten better.  A lot of people have opened

24  back up.

25  Q    Okay.  In addition to the problem with bridge lenders,

1  what issues were caused by the UCC issues that were testified

2  to earlier?

3  A    Well, EagleBank, who was never a lender -- we've never

4  gotten any money from EagleBank -- had filed -- actually, they

5  filed two UCCs, each lasting five years.  And we never owed

6  them any money.  So it was confusing the lender because -- the

7  lenders because they thought we still owed EagleBank.

8          We had made a loan with Eagle Commercial Ventures.

9  Q    And when was that loan paid off?

10  A    That loan we paid off was May 22, 2018.

11  Q    Okay.  But there are filings in the land records

12  subsequent to that?

13  A    Yeah.  EagleBank filed one in 2018.  And then they filed

14  another one 2023.  Yes.

15  Q    Are you aware of what the UCC filing looks like in the

16  land records today?

17  A    Yes.

18  Q    And explain what that is.

19  Q    Well, they -- you have your original filing, which is a

20  UCC1, which Eagle Commercial Ventures did.  And that was fine.

21  That was in June of 2013.  And before we got the loan with

22  Cetera, they wanted to make sure that EagleBank was paid.  But

23  we had told them that Eagle Commercial Ventures was paid off

24  in full.  And we reached out to them and they didn't respond.

25  So I talked to SDAT and they said we could file a termination

 1 ourselves if we were sure that they were paid off.  And I said

 2 yes, I've got releases.  We're sure we paid them off.

 3          And so the person as SDAT helped me do that.  Now, I

 4 had never done that before.

 5 Q    Is there anything still out there that can cause, at

 6 least, some sort of issue with lenders going forward?

 7 A    Yes.

 8 Q    What is that?

 9 A    Well, EagleBank never filed a termination.  Eagle

10 Commercial Ventures, when Mr. Simmons brought it to their

11 attention in August, Mr. Lexington filed a termination.  But

12 EagleBank has never filed a termination.  And they've had the

13 lapse date shown in the computer is June 20, 2028.  So when

14 people look at the filing, it looks like they've got their

15 lien through June, 2028.

16 Q    Okay.  Notwithstanding that, you are asking the Court to

17 give you an extra six months to try to refinance out the

18 secured debt.  What makes you confident that you are going to

19 be able to accomplish that in the six months?

20 A    Well, the market has gotten better.  And now we know what

21 happened with EagleBank.  Before, initially people would ask

22 us about it.  We had no idea that they had filed anything like

23 that.  And I remember talking to a lender and they said, well,

24 that doesn't make sense what you are saying.  Why would a

25 lender called EagleBank, who you never got a loan with ever --

1  why would they file a UCC lien?  It -- they weren't

2  understanding that when I would say that we don't owe them any

3  money.

4          So they thought we owed money to Eagle Commercial

5  Ventures and we owed money to EagleBank because EagleBank --

6  Eagle Commercial Ventures had their -- never filed a UCC3

7  termination at all.

8  Q    And do you believe, going forward, that you are going to

9  be able to explain to any potential lenders --

10 A    Right.

11 Q    -- what is going on?

12 A    Now I can explain it because now I understand it.

13 Q    Okay.  Let's turn to distributions under the various

14 plans.  To your knowledge, what payments have been made under

15 the plans and to what creditors?

16 A    There is a -- for Burtonsville there is like $335.

17 Something like that.  I made that.  And also for ElderHome,

18 that was $325, 35 something like that.  And we made payments

19 to the other two unsecured creditors.

20 Q    Do you know approximately what is the total amount that

21 has been paid thus far?

22 A    I think about 8,000.  Maybe 9,000.  Something like that.

23 Q    And have any administrative expenses been paid post-

24 confirmation?

25 A    No.

1  Q    Have you and Tom received any payments as equity holders

2  since the confirmation?

3  A    No.

4  Q    But the U.S. Trustee was relying on post-confirmation

5  reports that were filed.  First, for the administrative

6  expenses, is it correct that it asked for aggregate payments

7  from the inception of the case?

8  A    Yes, that's what the instructions say, to do it pre-

9  confirmation.

10  Q    Okay.  So that a number that would appear on a post-

11  confirmation report would include pre-confirmation admin

12  expenses?

13  A    Yes.

14  Q    Okay.  How about the equity payments?

15  A    Yes.  I --

16  Q    Why did those appear in post-confirmation reports?

17  A    Well, I read the instructions and they are confusing, but

18  it says -- it says right in there that the payments are

19  broadly construed.  They use the word "broadly."  And they

20  also said to make sure you include any -- they didn't use

21  "payments."  They used a different word.  But to make sure you

22  include things that the principals have paid on behalf of the

23  companies.  And so we have been putting all of our time in for

24  free.  So I included our time, you know, into that figure.

25  Q    Okay.  But it does not reflect actual payments made by

1  the Debtors to you and Tom?

2  A    No.  Because the Debtors have no money.  I mean, there

3  are no -- they are not income producing.

4  Q    And isn't it a fact that under the plan, equity is

5  receiving no money under the plan?

6  A    Pardon?

7  Q    Equity holders are not receiving anything under the plan?

8  A    No.  We don't receive -- yeah.

9  Q    Okay.

10         MR. GROCHAL:  I have nothing further.

11         THE COURT:  Ms. Stevens, would you like to cross

12  examine Ms. Norris?

13         MS. STEVENS:  Yes.  Just a second, Your Honor.

14      (Pause.)

15                    CROSS EXAMINATION

16      BY MS. STEVENS:

17  Q    Good afternoon, Ms. Norris.  My name is Lisa Stevens and

18  I am a trial attorney with the Office of the United States

19  Trustee.

20         Just a couple questions to ask you.  You said that

21  you -- that the dist- -- you are familiar with the

22  distributions that have been made under the plan; correct?

23  A    Yes.

24  Q    And you testified that Burtonsville paid about 325,

25  335 --

1   A       Yeah.

2   Q       -- on its general unsecured creditors; correct?

3   A       Correct.

4   Q       And that is 100 percent of the Burtonsville unsecured

5   creditors; correct?

6   A       I think so, yeah.

7   Q       Okay.  Now -- and I think that is all that they have for

8   Burtonsville.

9           With respect to ElderHome, you testified that you --

10  that eight to $9,000 was paid to general unsecured creditors?

11  A       Yes.  Or something like that.  I can't remember.

12  Q       And the anticipated payments under the plan are about

13  25,000; right?

14  A       Something like that.

15  Q       Where did the money come to make those payments to the

16  general unsecured creditors?

17  A       Tom and myself.

18  Q       Okay.  And so you and your husband put money to pay the

19  general unsecured creditors.  Do you know when you made those

20  payments?

21  A       I don't remember.

22  Q       Is it fair to say, based off the last report, that none

23  of those payments were made in the last quarter, is that

24  correct?

25  A       That last quarter.  I started a quarter earlier than we

1    needed to.

2    Q    So you are saying that the amount that has been paid to

3    date were for two quarters?

4    A    Yeah, because we -- yeah, I started earlier.

5    Q    And is there any reason to believe that you won't be

6    making those payments in this current quarter?

7    A    I don't see any reason.

8         (Pause.)

9         MS. STEVENS:  I think that is all the questions I

10   have.  Thank you.

11        THE WITNESS:  Thank you.

12        THE COURT:  Thank you, Ms. Stevens.

13        Mr. Kokolis, any cross examination for Ms. Norris?

14        MR. KOKOLIS:  I don't have any for Ms. Norris.

15   Thank you.

16        THE COURT:  Thank you.  Anyone else?

17        Mr. Lichtenstein?

18        MR. LICHTENSTEIN:  No, Your Honor.

19        THE COURT:  Mr. Leavers, no?

20        MR. LEAVERS:  No, Your Honor.

21        THE COURT:  All right.  So I just have one question

22   for you, Ms. Norris.  I just want to make sure I understand.

23   The post-confirmation reports that were filed last month go

24   through June 30th.  And according to these reports, the

25   cumulative amount paid to equity interest for ElderHome is

1  48,930 and for Burtonsville Crossing it is 34,759.  I believe

2  your testimony is that that was for your and Mr. Norris' time

3  that you put into the Debtors.  Is that correct?

4           THE WITNESS:  Yeah, and we are -- yes.  And we are

5  also paying for utilities, electric, phone.  You know, things

6  like that.  So the instructions had said to include any

7  ongoing operating expenses, you know?  So I thought that was

8  part of what I was supposed to do.  I don't know.

9           THE COURT:  So those were not distributions to you

10  and Mr. Norris?

11           THE WITNESS:  No.  No.

12           THE COURT:  Those were -- that is to compen- -- that

13  is what you believe your time should be compensated at?  And

14  that also includes out of pocket expenses that you and

15  Mr. Norris paid?

16           THE WITNESS:  Correct.

17           THE COURT:  All right.  Thank you.

18           Mr. Grochal, any redirect?

19           MR. GROCHAL:  No, Your Honor.

20           THE COURT:  All right.  Thank you, Ms. Norris.  You

21  may return to your seat.

22      (Witness excused.)

23           THE COURT:  Any other witnesses, Mr. Grochal?

24           MR. GROCHAL:  No, Your Honor.

25           THE COURT:  Mr. Kokolis, are you putting on any

1  witnesses?

2         MR. KOKOLIS:  Yes.  I would like to put on one

3  witness, Your Honor.

4         THE COURT:  Okay.

5         MR. KOKOLIS:  I would like to call Mike Patel to the

6  stand.

7         THE COURT:  Okay.  Mr. Patel, you may come up to the

8  witness stand.

9         THE CLERK:  Please raise your right hand.

10  Whereupon,

11                         MIKE PATEL

12  was called as a witness by Millenium Investment Group, LLC,

13  having been first duly sworn, was examined and testified as

14  follows:

15         THE CLERK:  Please be seated.  State your name and

16  address for the record.

17         THE WITNESS:  Mike Manoj Patel, 9956 Via San Marco

18  Loop, Fort Myers, Florida, 33905.

19         THE COURT:  You may proceed.

20         MR. KOKOLIS:  Thank you.

21                    DIRECT EXAMINATION

22     BY MR. KOKOLIS:

23  Q    Good afternoon, Mr. Patel.  Could you please tell the

24  Court your title and what your background is?

25  A    Sure.  I'm a consultant over at National Hospitality

1   Consulting Group.  I'm the CEO and Director of Operations.  I

2   also develop commercial properties, hotels, multi-family

3   assisted living, resorts.  We also provide bridge financing,

4   debt fund.  We're affiliated with a number of lenders, banks,

5   family offices.  So we're actively participating in every

6   array of every sector of the real estate industry.

7   Q    And how long have you been in the industry?

8   A    About 30 years.

9   Q    Okay.  And how are you familiar with Millenium Investment

10  Group?

11  A    Millenium Investment reached out to me about a year and a

12  half ago needing assistance to help them work through the

13  issues on the Burtonsville properties.  So they had asked me

14  to step in because they may have been emotionally involved.

15  So they said I would like a neutral standpoint, assist working

16  with counsels to get to a settlement agreement so we can move

17  on.

18  Q    Okay.  And what are your specific duties in your role at

19  the Hospitality organization?

20  A    I am in charge of -- I traditionally testify in courts in

21  terms of plan feasibilities.  I've acted as CROs in a number

22  of cases over the past couple of years.  I've worked with both

23  debtors and I've work with both creditors.  So I understand

24  both sides of the equation.  And that builds a lot of value

25  because I'm understanding limitations and shackles on both

 1 ends and how to get a deal accomplished.

 2 Q    Okay.  And can you explain what familiarity you have with

 3 this particular transaction?

 4 A    This transaction is a development transaction that has

 5 been stalled for a number of years in the entitlement process.

 6 In any development, the entitlement process is the first leg

 7 in order to get a project developed.  But if it exceeds more

 8 than two years for an entitlement, there are issues with the

 9 project.  And in this particular case, I think it's been over

10 four years, right?  Four years and there isn't any substantial

11 documentation or written confirmation letter indicating that

12 the project has been entitled for the development intended.

13 Q    And how are you familiar with that information?

14          MR. GROCHAL:  Your Honor, I object to this line of

15 questioning.  I mean, we are -- I thought we are here on the

16 motion to modify the plan.  If they are trying to qualify him

17 as an expert, he certainly seems to be giving his opinion of

18 entitlements and where my client's case is going.  But he

19 hasn't been qualified as an expert.  I don't think he can do

20 that.

21          THE COURT:  Mr. Kokolis, are you attempting to

22 qualify him as an expert?

23          MR. KOKOLIS:  I would like to qualify him as an

24 expert, if that is possible.  If not, then I can have him

25 testify to the direct knowledge that he has with respect to

1  the entitlement work on this particular transaction and then

2  the market conditions with respect to this transaction.

3         THE COURT:  Well, the Court -- based on what the

4  Court has heard so far, the Court is not going to qualify him

5  as an expert.  The Court will give you some leeway with your

6  questioning and the Court will place whatever weight the Court

7  deems appropriate on his testimony.  But I want to make sure

8  he is testifying as a fact witness at this point, so he needs

9  to testify about facts first.

10         MR. KOKOLIS:  Sure.

11         THE COURT:  And he is not really here to testify

12  about his opinion unless you are able to lay the groundwork

13  for him to be qualified as an expert.

14         MR. KOKOLIS:  Okay.  Thank you, Your Honor.

15      BY MR. KOKOLIS:

16  Q   Can you tell me how you are familiar with the entitlement

17  process of this particular transaction?

18  A    Sure.  When the motion to extend was filed, the first

19  thing we did was look back and see did we receive any

20  documentations per the plan of reorganization that kept us in

21  the loop whether or not the entitlement process has been

22  ongoing?  We haven't received anything.  So what I did was I

23  contacted Montgomery County Planning and Development and I

24  spoke to them directly and asked has there been an entitlement

25  issued on this project?  And they said no.  It's coming up for

1  a hearing, --

2          MR. GROCHAL:  Objection.

3          THE WITNESS:  -- but it has not been issued.

4          MR. GROCHAL:  Objection.  He is testifying as to

5  what someone in Montgomery County told him, not that he has

6  personal knowledge of.  And additionally, he is claiming no

7  documents were provided.  If his counsel had decided not to

8  share the documents we gave him with his witness, that is not

9  my problem.

10          THE COURT:  So --

11          MR. KOKOLIS:  There have been no documents provided

12  to our firm from their clients.

13          THE COURT:  Well, hold on.  Hold on.  Direct your

14  comments to the Court.

15          So why is this not hearsay?  He is testifying about

16  what somebody from the county told him.  I mean, he can state

17  that he has not seen anything regarding the entitlement

18  process, but I don't -- he can't testify about --

19          MR. KOKOLIS:  Sure.

20          THE COURT:  -- what somebody told him.

21          Mr. Grochal?

22          MR. GROCHAL:  For the record, documents were

23  provided to his co-counsel, Mr. Perlman.

24          THE COURT:  I hear you, but right now we have a

25  witness on the stand.

1          MR. GROCHAL:  Okay.

2          THE COURT:  So let's let the witness finish and then

3   we can discuss that later.

4          BY MR. KOKOLIS:

5   Q    What have you reviewed that indicates that this property

6   has made any progress through the entitlement process?

7   A    So there are documents filed.  I am not disagreeing with

8   that.  What I'm saying is there are no entitlements that have

9   been issued to the property currently today.

10  Q    And that is based on your review of the information

11  available at Montgomery County?

12  A    Review of the existing documents that have been filed.  A

13  decision has been made so the property is not entitled as yet.

14  Q    So if the property is not entitled, how would that impact

15  financing for the Debtors?

16  A    That's a good question.  Because a lender is going to

17  ask, do you have that entitlement letter to show that the

18  project has been entitled?  It mitigates the risk for a lender

19  coming in.  And they are going to require to see that letter

20  and that letter hasn't been provided because it doesn't exist.

21  Q    And would MIG have required that same information?

22  A    Yes.

23  Q    Okay.  And based on your review of the entitle- -- where

24  things stand as far as entitlements are concerned and that

25  information not being produ- -- or unable to be produced to a

1  lender, what -- from your -- you know, where do you see -- are

2  you aware of any loans that would be issued under these

3  circumstances?

4          MR. GROCHAL:  Objection.  Calls for opinion

5  testimony.

6          THE COURT:  The objection is overruled.  The Court

7  is going to give Mr. Kokolis a little bit of leeway here

8  because the Court allowed Mr. Norris to testify along similar

9  lines.  But I do feel like we are starting to get into expert

10 opinion territory.  And either he is a fact witness or he is

11 an expert giving his opinion.  But he has not been qualified

12 as an expert.

13         Mr. Grochal?

14         MR. GROCHAL:  My understanding of the law is that

15 the owner can testify as to the value of the property.  And

16 that is why I attempted to elicit from him.  But this

17 gentleman is not an expert and he is not the owner.

18         THE COURT:  That is correct.  That is the correct

19 state of the law.

20         MR. KOKOLIS:  Okay.

21    BY MR. KOKOLIS:

22 Q    With --

23         THE COURT:  And I want to remind the parties that

24 the real issue here is whether there has been substantial

25 consummation.  I think we can all agree that the market has

1   been a bit of a mess over time.  And who knows what that

2   impact has had?  I don't think anybody can really put their

3   finger on that.  But I want to give you an opportunity to try

4   and get in whatever testimony you want to get in.  But I feel

5   like we are venturing into expert opinion territory.  He has

6   not been qualified as an expert.

7          MR. KOKOLIS:  Okay.

8      MR. KOKOLIS:

9   Q    Mr. Patel, with respect to the testimony that has been

10  laid by the Debtors in the case and the -- you haven't seen

11  any letters of intent with respect to loans being made on this

12  property, have you?

13  A    Correct.  We have seen nothing.

14  Q    Okay.  And the -- and you are not aware of MIG receiving

15  any such information either?

16  A    Correct.

17  Q    Okay.  What information have you reviewed with respect to

18  the Burtonsville Crossing property that was originally under

19  contract with the church?

20  A    I reviewed the file about a year back.  I really don't

21  have much reflection on it right now except that there were

22  disputes on that with encroachment, right?

23  Q    Okay.  And you haven't seen any letters of intent with

24  respect to that property either?

25  A    It was only hearsay, but I haven't seen anything

1  materialized.

2  Q    Okay.

3       MR. KOKOLIS:  I don't think I have any further

4  questions at the moment, Your Honor.

5       THE COURT:  Thank you, Mr. Kokolis.

6       Does anybody have cross examination?  Ms. Grochal?

7       MR. GROCHAL:  Just a couple.

8                    CROSS EXAMINATION

9  BY MR. GROCHAL:

10 Q    You said you became involved again after the motion to --

11 for an extension of time was filed.  Did Mr. Perlman share

12 with you any of the documents that were provided to him?

13 A    Yes, he did.

14 Q    So you, in fact -- you said you received no documents.

15 A    No.  No.  I said I haven't received anything of material

16 evidence that shows that entitlement has been achieved and/or

17 a term sheet, or an LOI is being produced.

18 Q    Mr. Norris testified that they are 90 percent of the way

19 through the entitlement process and that it is scheduled now

20 to wind up in February.  Do you have any personal knowledge to

21 dispute that?

22 A    I do.

23 Q    What is it?

24 A    There could be a number of complications.  Up until the

25 entitlement is approved, it could go back into a rejection,

1    correction, rejection, and correction.  I don't know the

2    process, but I know that if it has gone on for four years, it

3    could go on another year again.

4    Q    Well, that is speculation.  But do you have any personal

5    knowledge that it is going to be rejected and that the

6    February date is not going to happen?

7    A    No.  No.  No.  I don't.  I don't.

8              MR. GROCHAL:  Nothing further.

9              THE COURT:  Thank you.  Any further questions for

10   Mr. Patel?

11      (No verbal response.)

12             THE COURT:  Hearing none, Mr. Patel, I do have a

13   couple of questions for you.  What is the name of your company

14   again?

15             THE WITNESS:  National Hospitality Consulting Group.

16             THE COURT:  And what is your first name again?

17             THE WITNESS:  Manoj, M-a-n-o-j, Patel.

18             THE COURT:  Spell that again.

19             THE WITNESS:  M-a-n-o-j.

20             THE COURT:  And Patel is P-a-t-e-l?

21             THE WITNESS:  Correct, Your Honor.

22             THE COURT:  Okay.  Thank you.  That is all the

23   questions I have.

24             THE WITNESS:  All right.

25             THE COURT:  You may return to your seat.  Thank you

1    for your testimony.

2        (Witness excused.)

3            THE COURT:  Any further evidence to be introduced by

4    any parties?

5        (No verbal response.)

6            THE COURT:  All right, hearing none, are the parties

7    ready to go into closing arguments?

8            MR. GROCHAL:  I am, Your Honor.

9            THE COURT:  Ms. Stevens?  Mr. Kokolis, are you

10   ready?

11           MS. STEVENS:  Yes, Your Honor.

12           THE COURT:  Would you like to take a short break?

13   Anybody?

14           MR. GROCHAL:  I am good.

15           MR. KOKOLIS:  We can roll into it.

16           THE COURT:  All right.  Let's keep going then.

17   Closing arguments.

18           Mr. Grochal.

19            CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

20           MR. GROCHAL:  I think I said at the outset that we

21   would show a few things.  And I think the testimony has born

22   that out.  I have shown, first of all, that the Norris' were

23   not just sitting around twiddling their thumbs for the last 12

24   months.  They moved the development process along and they

25   attempted, through 50 plus lenders, to refinance the property.

1         We have also established that there were some

2    obstacles in their way.  The fed raising the interest rate an

3    unprecedented number of times.  And then the EagleBank --

4    Eagle Ventures continuation statement of release issue.  You

5    know, whether it is, you know, harmless or not, if it is not

6    harmless to a bank, it doesn't really matter.  And I think the

7    testimony from Ms. Norris was pretty clear that it was causing

8    problems because it was making people think that either the

9    Debtors owed money to both Eagle Ventures and EagleBank, or

10   one, but not both, were paid off and therefore there was

11   another million dollars that was not disclosed and the like.

12        And remember, Your Honor, the plan -- the only thing

13   we are trying to do is get an extension in time to refinance

14   the secured debt.  So Your Honor made specific findings when

15   you confirmed the plan on September 8th of last year that have

16   met all the criteria under the Bankruptcy Code and the like.

17   So the only thing we are asking for is a six-month window to

18   extend the time to comply with that particular condition of

19   the plan.

20        So it meets all the conditions.  The question, I

21   guess, is -- in part, is good faith.  And based on the

22   obstacles they have faced, I would, again, cite to the Litton

23   case.  I think it is somewhat similar.  When you have

24   unforeseen roadblocks in the way, that is good cause for

25   asking for additional time.

1          Then the other issue is whether there has been

2     substantial consummation of the plan.  And when you parse

3     through the testimony here, you realize, okay, it was --

4     according to the chart produced by Ms. Stevens, there was like

5     $7,000 paid to unsecured creditors.  I think Ms. Norris'

6     testimony thought it was eight or 9,000.  But I don't think

7     that really matters.  We also have testimony that the total

8     secured debt is $5.5 million.

9          So the question is, under either the plain meaning

10    of 1127 language or under the case law -- and even the cases

11    they cited I think are ultimately hopeful -- whether $7,000

12    paid out of $5.5 million equates to substantial consummation.

13    And, again, I would suggest that the one -- the Dam Road Mini

14    Storage case is probably an aberration just because if the

15    Debtor spends four years and accomplishes absolutely nothing,

16    I would think most bankruptcy judges would be inclined to turn

17    down the relief that they seek.

18          But let's look at the big picture here for a second.

19    We are asking for another six months.  In that six months MIG

20    will accrue interest at 12 percent.  Much higher than any bank

21    is offering it these days.  And they are in first place and we

22    have got opinion of value between nine and $10 million.  So

23    they are coming out whole.  You know, I could say, you know,

24    no good deed goes unpunished because we are doing them a

25    favor.  They are going to get 12 percent for the next six

months on here.  Obviously, that is not their choice for

whatever reason.  And if they had put one of their --

Mr. Kokolis had put his client on the stand, I would have

asked him that.  If you foreclosed and got money paid next

month, where could you invest it and get 12 percent return on

your money?

Okay, so we have got the first.  If there is an

auction sale, will there be money for Mr. Leavers' client?

Well, Mr. Leavers certainly hopes so, but we just don't know

for sure because you have a property that, we believe, is

pretty far along in entitlements and the like.  But whoever

would buy it at an auction sale would have none of that.  I

think that everyone could agree to that and they wouldn't have

engineering and they would be starting from scratch.  And

there is no question that that would depreciate the value

significantly.

So it would certainly benefit every creditor in the

case.  MIG will come out whole regardless.  I would probably

concede that.  But everybody else is going to be assured of

getting payment.  And the worst case is we are six months down

the road.  MIG gets another 12 percent interest on their debt.

And if we can't do it, we can't do it.  We are not asking for

-- I didn't call it the first motion to modify the plan for a

six-month extension because I realize the Court is not, you

know, just give us serial extensions on this.  We have got to

1    do it now.  The testimony is that the bridge loan market is

2    back up and running again.  They can explain around the

3    EagleBank UCC filing.

4         We are ready to go.  We have got some LOIs.  They

5    need further negotiation, but we believe we can get to the

6    finish line.  And if we can't, that is our problem.  We will

7    not come back here and ask for a further extension.  I think

8    there was an illusion somebody made to, they are going to ask

9    for another year and the like.  That will not happen.  We are

10   asking for this once and once only to do.  And it will benefit

11   the citizens of Montgomery County.  If we can get to the

12   finish line and senior living can get built in Burtonsville in

13   the not too distant future where there is a great need, then

14   it will benefit everybody.

15        So even though MIG is dead set against this, I

16   actually think we are doing them a favor, at least,

17   economically.  Maybe they think they can buy it in cheaply and

18   take over the property.  I don't know what their motivation

19   is.

20        I had a client years ago who had a 14 percent

21   interest in -- on a client of mine's project.  He was

22   disappointed when we started selling off lots.  He was at 14

23   percent interest.  He hoped we would have spent another two,

24   three years before we sold stuff.

25        Anyway, I think we made the payment -- the points,

1    Your Honor.  And I think that if you look at substantial

2    consummation, there is no way that paying $7,000 -- which

3    actually, interestingly, apparently came out of the Norris'

4    pockets, not even out of the Debtor, although I assume that

5    would be still counted as a post-confirmation payment -- out

6    of 5.5 million is not substantial consummation, even under the

7    Mini Storage case which talked about preponderance of a debt.

8    But doesn't take a math major to conclude that 7,000 over 5.5

9    million is nowhere close to a preponderance.  Thank you.

10            THE COURT:  Mr. Grochal, I have a couple of

11   questions for you.  So Section 1101-2 defines substantial

12   consummation as requiring three things.  And it is in the

13   conjunctive so all three are required.  Under 1101-2; (a), it

14   means a transfer of all or substantially all of the property

15   proposed by the plan to be transferred; (b), assumption by the

16   debtor under the plan of the business or of the management of

17   all or substantially all of the property dealt with by the

18   plan; and (c), commencement of distribution under the plan.

19            So in 2(a), we have the word "substantially."  In

20   2(b) we have the word "substantially."  But in 2(c) there is

21   not a requirement, based on what I am reading, of a

22   substantial distribution.  It just says "commencement of

23   distribution under the plan."  So how can the Court reconcile

24   the language of Section 1101-2 and the Debtors' position that

25   although some distributions have been made, there has not

1   really been a commencement of distributions under the plan?

2              MR. GROCHAL:  Okay.  Because 1101-2 -- it is (a),

3   (b), and (c), which means to show substantial consummation.

4   The objectors must establish all three.

5              THE COURT:  Right.

6              MR. GROCHAL:  All we need to do is drive a wedge

7   through any one of them and it is not substantially

8   consummated.

9              THE COURT:  Okay.  So is there any that you concede

10  has been met here?  So, for example, 2(b), assumption by the

11  debtor under the plan of the business or of the management of

12  the property dealt with by the plan, does the Debtor concede

13  that 2(b) has been satisfied here?

14             MR. GROCHAL:  Probably.  So look, a little hard to

15  parse through it, but --

16             THE COURT:  And what about (a)?  So the plan does --

17  the question the Court has with regard to 2(a) is that the

18  plan does require a sale of the Burtonsville Crossing property

19  to Canaan Church.  That worked its way all the way up to the

20  Fourth Circuit.  That is not going to happen.  And so the

21  Debtors are pursuing an alternative.  Does that mean that 2(a)

22  has not been satisfied?

23             MR. GROCHAL:  I would say 2(a) has not been

24  satisfied.  And even though (c) says --

25             THE COURT:  Well, let's talk about 2(a).

1              MR. GROCHAL:  Okay.

2              THE COURT:  Why has 2(a) not been satisfied?

3              MR. GROCHAL:  Well, it says, "Transfer of all or

4   substantially all the property proposed by the plan to be

5   transferred."  I mean, I think it -- I don't think anything

6   has been transferred.  No property has been transferred.

7              THE COURT:  Okay.

8              MR. GROCHAL:  And, I mean, I know (c) says

9   "commencement of distribution under the plan," but if -- but

10  the cases suggest that you -- maybe there is a *de minimis*, you

11  know, threshold and the like.  You know, if I pay one dollar

12  to one creditor, that shouldn't satisfy (c).  And if you read

13  the cases interpreting it such as <u>Litton</u>, I think that is

14  consistent with that.  They look at both the dollars paid and

15  to be paid and also the number of classes of creditors who

16  have been paid and the number of classes of creditors who have

17  not been paid.

18             THE COURT:  Okay.  Thank you.

19             MR. GROCHAL:  Thanks.

20             THE COURT:  Who would like to be heard next?

21  Ms. Stevens?

22             CLOSING ARGUMENT ON BEHALF OF THE U.S. TRUSTEE

23             MS. STEVENS:  Thank you, Your Honor.

24             I am -- my notes are going to be a little jumbled,

25  so I am sorry and I apologize in advance for that.

1          THE COURT:  That is okay.

2          MS. STEVENS:  And I know the Court has thoroughly

3   read the papers and heard the evidence presented here today.

4   The Debtors carry the burden to establish that the plan has

5   not been substantially consummated, which turns on the facts

6   of the case.  The Debtors have not and cannot meet their

7   burden.

8          So I want to go back to a couple questions that the

9   Court just was focusing on with the language of substantial

10  consummation.  It was my understanding from their papers that

11  they were not contesting (a) or (b).  With that being said, it

12  does sound like they are saying that (a) doesn't apply.  I am

13  happy -- I don't have the cases with me, but I am happy in

14  researching that issue.  Once the property has been

15  transferred to the reorganized debtor, it meets 1101-2(a).  I

16  don't have the cases here, but that is my understanding, is

17  that once the plan -- the plan itself constitutes a transfer

18  to the reorganized debtor, which is of all or substantially

19  all of the property.

20         (B), with the assumption, they have taken over --

21  the plan shows that they are the party in control.  And I

22  would like to focus, like Your Honor is, on (c), which says,

23  "commencement of distribution under the plan."  And looking at

24  this just quickly today, there is a case, In Re: Bullion

25  Hollow Enterprises, 185 B.R. 726 from the United States

1    District Court for the Western District of Virginia.  And it

2    says,

3        "Distribution of payments to creditors need only be

4        commenced for there to be substantial consummation if

5        the requirement to the other subsections are met as

6        well."

7            So the --

8        "Next, the court must determine whether payments to

9        creditors had, in fact, commenced under this plan.

10       There is no percentage or specific number of payments

11       needed to have been paid in order to qualify as

12       commenced.  For example, the court in Stevenson held

13       that a plan had only been substantially consummated

14       after the debtor had made only two of 26 payments to

15       creditors.

16       Likewise, in the In Re: Hurley case, the court held

17       that a plan had been substantially consummated one

18       day after the first payments were made to creditors

19       under the confirmed plan."

20           And then in this case, there is no dispute that

21   payments to creditors have been paid and made.

22           THE COURT:  So what about the North Carolina line of

23   cases, Dean Hardwoods, McDonnell Horticulture, the Virginia

24   case of In Re: Litton that say that commencement of

25   distributions under 2(c) means not just a beginning of

1   payments to a creditor, but commencement of distribution to

2   all or substantially all creditors?  We have a split in

3   authority here.  We have some cases that say there has to be

4   substantial distributions and some cases that say just

5   commencement of any distribution is enough to trigger 2(c).

6   So why should this Court, when there is no binding authority

7   in the Fourth Circuit or in the District Maryland -- why

8   should this Court adopt one over the other?

9           MS. STEVENS:  Well, I think that there is other

10  factors to be looked at in this case besides just the payment

11  and the distributions of creditors.  This plan is a contract.

12  It was negotiated by competent counsel.  I think everyone will

13  agree that the parties understood what they were getting into.

14  There is more to the contract than just the payments that were

15  made.  There were concessions, there were releases that were

16  given under the plan that, you know, established a -- they

17  were bargained for.  They did.  And they occurred.

18          So I think the plan has already been baked.  It has

19  already been established.  And so we are not going to undo the

20  plan?

21          THE COURT:  But isn't that always going to be the

22  case when there has been some dispute in the case with a

23  creditor?  The Court remembers well the extent of the

24  negotiations between the Debtors and MIG.  It -- there were

25  extensive negotiations.  As Mr. Kokolis said, we had regular

 1  status conferences.  And I think when I approved the

 2  settlement, I -- or at the -- maybe it was at the confirmation

 3  hearing, I even commented that the Court was amazed that they

 4  were able to reach a resolution because of how far apart they

 5  started.  But they all worked hard at it.  They made it

 6  happen.

 7          We have a confirmed plan.  It is a binding contract,

 8  but we also have Section 1127, which contemplates a situation

 9  in which a modification may be appropriate when the

10  circumstances warrant.  And so the questions I have are do the

11  circumstances warrant?  And has there been substantial

12  consummation?  Because at that point the right to modify is

13  cut off.

14          MS. STEVENS:  Okay.  So, Your Honor, there is two

15  issues, I think, that you are focusing on.  So one of them,

16  are there circumstances present here that would be an

17  exception to the rule?  And I think that the exception -- the

18  circumstances that the Debtor has proposed is that they could

19  not foresee these market conditions and that the refinancing

20  couldn't happen.  I think that is a red herring.  I think they

21  know and they knew that there could be changes in the market

22  conditions.  And I am not going to be the first to say that I

23  understand entirely the EagleBank and that Mr. Lichtenstein

24  and Mr. Grochal can explain that.

25          But it seems to me that the Debtors knew or should

1   have known about that issue before they did the negotiation of

2   the plan.  And if it is not and if it is an issue that just

3   came up in June of this year, the release or the termination

4   was done in August.  So I don't think that those two months

5   are what upset this refinance.  So I don't think that the

6   exigent circumstances that are being proposed here are really,

7   in fact, present.  So that is the -- to address your one

8   issue.

9           And then the second issue -- I forgot.  Would you

10  please remind me?

11          THE COURT:  So it is when the Court considers

12  substantial consummation.  Should the Court adopt the line of

13  cases that you are citing to or the line of cases that

14  Mr. Grochal has cited to on behalf of the Debtors?  So do we

15  -- should the Court adopt the position that substantial

16  payments are required for there to be substantial

17  consummation?  Or should the Court adopt the approach that any

18  commencement of distributions is substantial consummation?

19          MS. STEVENS:  Well, Your Honor, Section 1101-2(c)

20  says commencement.  And you already focused that the word

21  "substantial" is not in that language.  So I think -- I am not

22  going to tell the Court what they should do.  But I am going

23  to say that I think the plain reading of the Code should be

24  the guide.  And "substantial" is not in there.

25          And I don't understand what "substantial" would be

1   in this case because for purposes of Burtonsville, they have

2   paid 100 percent of their general unsecured creditors.

3           THE COURT:  $325 though.

4           MS. STEVENS:  Hey, I will take it.  It was for the

5   United States Trustee fees from their last case.  So again --

6           THE COURT:  Understood.  But --

7           MS. STEVENS:  And again, I think that is where you

8   have to make the decision on whether that is substantial or

9   not.

10          THE COURT:  So let me tell you what jumped out at me

11  and I would like to hear the U.S. Trustee's thoughts on this.

12  If we take the chart that the U.S. Trustee included in its

13  objection, which came from the post-confirmation reports of

14  the Debtor, take the administrative claims out of the analysis

15  because those were paid pre-confirmation.  So we are talking

16  about under 1101-2(c), commencement of distributions under the

17  plan.  So take the admin claims out because they were not paid

18  under the plan.

19          We heard testimony, which has not been controverted,

20  and make sense to the Court that the amount represented as

21  distributions to equity were not distributions to equity at

22  all.  Those were out of pocket expenses paid by the Principals

23  and what they -- the value they assigned to their time and

24  their investment.  So we take those out.

25          If we just look at the claims that have been paid in

1    ElderHome, 6,000 -- according to the reports, we will use that

2    -- $6,575 out of $4,251,569.  That is .15 percent of the

3    claims that were paid.  When you look at Burtonsville

4    Crossing, you get an even more extreme example.  $325 was

5    paid.  The claims totaled $4,220,703.  That equals .0077

6    percent.

7            So is there, for lack of a better term, a

8    materiality requirement?  I think Mr. Grochal referred to it

9    as a *de minimis* threshold.  Is there some requirement that it

10   has to be more than a *de minimis* distribution, or in the

11   Court's words, a non-material amount paid?  I think we can

12   agree that $325 on $4.2 million, which is .0077 percent, is

13   not a material amount.

14           MS. STEVENS:  Well, Your Honor, but the plan --

15           THE COURT:  That is what I am struggling with.

16           MS. STEVENS:  But the plan only provided that those

17   -- that that 4 million -- the number that you are looking at

18   -- the only way that that would be ever paid for under the

19   plan was through a refinance.  That hasn't occurred.  So there

20   is -- if that is the way that we are to read this, then under

21   the plan, it can never be substantially consummated unless a

22   refinance occurs.  So we will be back here every six months to

23   modify this plan because we will never reach substantial

24   consummation.  That is the only way that those would be paid.

25   That is what the plan calls for, is that those will be paid

1    upon a refinance.  So those can't be paid absent that.

2              THE COURT:  But then going back to 1127 -- 1127(b)

3    says the plan, as modified, becomes the plan only if

4    circumstances warrant such modification.  So then to me that

5    is saying there has to be some kind of analysis of the factual

6    situation.  And if we are talking about a six-month extension,

7    maybe that is one thing.  If we are talking about a one-year

8    or two-year extension, maybe that is something else.  Because

9    it may not come into play for purposes of the definition of

10   substantial consummation, but it would certainly come into

11   play for purposes of 1127(b), which talks about modification

12   when circumstances warrant.

13             So that is kind of where my thoughts are.  And -- I

14   mean, let me give you an extreme example.  If one dollar were

15   paid to a creditor, would it still be the U.S. Trustee's

16   position that substantial consummation has occurred?  One

17   million -- one dollar on, say, $4 million in claims.  Would

18   that be a different -- would that still have the same result

19   or would that be -- lead to a different result because we have

20   to think about the circumstances?

21             MS. STEVENS:  Well, again, I don't want to speak on

22   speak on behalf the United States Trustee without, you know,

23   getting their opinion on the subject, so I will tell you what

24   I think personally.  I think that you do have to look at the

25   circumstances of the case.  And, you know, there have been

1   many cases where people or parties have appealed a

2   confirmation order and they consider them equitably moot the

3   second that one payment has been made.

4             So, again, I think that is a factual issue that the

5   Court has to decide.

6             THE COURT:  Thank you.  I interrupted you.  Is there

7   anything further?

8             MS. STEVENS:  No, I am -- I will look at my notes,

9   but I think we covered all of -- I think it covered all of my

10  points that have been made here at some point today.  Thank

11  you, Your Honor.

12            THE COURT:  Thank you very much.

13            Mr. Kokolis, you will have the benefit of the

14  Court's questions to Ms. Stevens.

15  CLOSING ARGUMENT ON BEHALF OF MILLENIUM INVESTMENT GROUP, LLC

16            MR. KOKOLIS:  Thank you, Your Honor.

17            I will reiterate the points that Ms. Stevens has

18  made in that there -- we have substantial consummation here.

19  And I think a unique point with respect to this case as far as

20  substantial consummation goes is that there was a settlement

21  involved that resulted in this confirmed plan, unlike other

22  cases where the plan was proposed by the debtor, it was voted

23  on by the creditors in the case, and then it was approved.

24            This plan could only have been approved but for the

25  settlement with MIG creditors.  And so there was an

1  opportunity at that time to negotiate every single term that

2  every party could think of with respect to the adversary

3  claims, the origination of the loan, the debt that was due,

4  the timeline in which MIG would be paid and other creditors

5  would be paid, the release of claims and the release of

6  securities and protections to MIG that it had going into the

7  bankruptcy proceeding.

8        We have this distinguishable element from other

9  bankruptcy cases that allowed this to become substantially

10 consummated much earlier than simply refinancing the property.

11 As Ms. Stevens said, the refinance is the ultimate final step

12 to pay all the creditors in the case.  And who is to say we

13 are not back in six months, another year, and this goes on,

14 and on, and on?

15       And I distinctly recall being in front of Your Honor

16 at the motion to dismiss hearing about two years ago where I

17 was requesting dismissal on bad faith.  And Your Honor had

18 said at this early stage of the proceeding, the pendulum is

19 more on the side of the Debtor.  And the longer the case goes

20 on, that pendulum moves.  And here we are two years after a

21 bargain for exchange, a settled agreement between the Debtor

22 and the primary creditor in this case containing all the terms

23 and how this was going to play out with a backstop at the very

24 end of there being an auction a year from the effective date,

25 and on the eve -- at the 11th hour of that effective -- of the

1  one-year anniversary, they are looking to amend.

2          It is MIG's position that that pendulum has now

3  swung to the other side.  The equities have changed.  It is

4  now time for the Court to look at this through the prism of

5  the creditor that his being harmed, that hasn't been paid in

6  five years.  There are not adequate protection payments.  The

7  original claim was over $4 million.  It has been reduced to

8  $3.3 million.  Interest is accruing with no payments and there

9  is no offer for payments with respect to this extension, just

10  an additional accrual of interest that they claim that MIG is

11  benefiting from a 12 percent interest rate.  The note rate was

12  significantly higher than that.  It was an 18 percent interest

13  rate.  We are not -- MIG is not getting the benefit of that.

14  The --

15          THE COURT:  I am sorry, it was how much?  Sixteen?

16          MR. KOKOLIS:  It was 18 percent.

17          THE COURT:  Eighteen?

18          MR. KOKOLIS:  So -- and then MIG made irrevocable

19  concessions at the beginning of the plan where it released its

20  dead of trust against the Norris' principal residence.  It

21  released it in an assignment of rents against their principal

22  residence.  It dismissed the foreclosure case that was pending

23  against their residence.  It dismissed the foreclosure against

24  the Burtonsville property and against the ElderHome property.

25  All in consideration of that settlement agreement.

1            So from a substantial consummation standpoint, MIG

2    certainly has upheld their end of the bargain.  And it seems

3    dully unjust to MIG that here, you know, a week before the

4    drop dead date that they are asking for an extension.  And as

5    we saw in the Dam Road Mini Storage case, that drop dead date

6    isn't -- that is the end.  There isn't a reason to extend

7    beyond that time because the sole remedy in that case was also

8    refinancing.

9            I think the last thing that I would point out, and

10   again, we believe that the plan is substantially consummated,

11   it would be looking at the plan itself through a particular

12   section here.  It is Section 9.01 regarding the modification

13   of the plan.  It says,

14       "Before or after the confirmation date or in the

15       confirmation order, that the Debtors may, with the

16       approval of court, so long as it does not materially

17       and adversely affect the interest of creditors who

18       have accepted the plan, remedy any defect or

19       omission, reconcile any inconsistencies in the plan,

20       or amend the plan."

21           They are asking to extend a plan that materially and

22   adversely affects the creditor in this case.  They knew that

23   this was a drop dead date.  They knew that they had 12 months.

24   And, frankly, they have had two years.  They have had time

25   even before the settlement was finalized to, you know,

1   entertain letters of intent, try to obtain financing.  There

2   was no start.  There was no green light the minute that the

3   plan was confirmed.  They could have taken efforts in those --

4   in that year before to try to obtain financing when the

5   lending conditions were better.

6          MIG, like I said, has not received a payment in over

7   four and a half years.  Now they are being asked to wait

8   another six months when the parties had agreed that October

9   24, 2023 was the end.  And as a result, we have filed our

10  opposition and we would request that the Court deny the motion

11  of the Debtors.

12          THE COURT:  I have a couple of questions for you.

13          MR. KOKOLIS:  Yes.

14          THE COURT:  So what about the other creditors here?

15  So Millenium is in the first lien position.  What about

16  Mr. Leavers' client who is in the second lien position and

17  Montgomery County who is not here, but the Court still has to

18  consider its interests?  If there is an auction of the

19  property, I think we can all acknowledge that they are likely

20  to receive less than they would if there were a marketed, you

21  know, refinancing effort.  So how much emphasis should the

22  Court put on their interests?

23          MR. KOKOLIS:  Well, I am not trying to say that one

24  creditor is in a different position than another.  Our client

25  is the first lien holder with respect to these properties.  It

1    would be the creditor that would stand to gain from an

2    auction.  But there is no telling what an auction will

3    produce.  If it is truly $10 million and it sells for a

4    discount of 30 percent on this -- at auction, that is still

5    plenty of money to pay for all of the creditors in this case

6    and then some.

7              THE COURT:  Well, except that the Court also -- the

8    equity holders are also parties in interest and the Court has

9    to consider their interest.  We tend to focus heavily on the

10   creditors and what they will receive in terms of a

11   distribution.  But the equity holders are parties in interest,

12   too.  They come very last.  And so the considerations of the

13   impact on the equity holders is somewhat less important, but

14   it is still there.  They are still parties in interest.  And

15   so this Court has to look out for the interests of all parties

16   in interest: secured creditors, priority unsecured creditors,

17   general unsecured creditors, and equity holders.

18             MR. KOKOLIS:  I understand that.  And there was a

19   point in this proceeding where we had filed a motion for

20   relief twice.  We had filed motion for relief from stay to

21   proceed with a foreclosure that would have had a detrimental

22   impact to all junior lien holders and the Debtors themselves.

23             We came to a compromise.  We found a way to try to

24   resolve the dispute so that there was an opportunity for

25   refinance or a sale of the property so that as many creditors,

1   including the Debtors themselves, could benefit from a

2   refinance or sale of the property.

3          But we also negotiated an end.  And we negotiated

4   that one year from the effective date.  If it wasn't sold,

5   there was going to be an auction.  And the Debtors understood

6   that.  And the Debtors understood that that was an end date.

7   And they understood that there would be consequences for not

8   refinancing the property and paying within that one-year time

9   period.

10          And so we are not dealing with a residential home

11  owner, a consumer in this case.  We are dealing with

12  sophisticated real property investors and real property

13  developers who have testified to having 40 years of experience

14  of being in the commercial real estate industry.  I think they

15  would know what a drop dead date is and what an end date is.

16  And they couldn't get the deal done.

17          And so, you know, for the benefit of not just my

18  client, but for all the creditors in this case, we need some

19  finality.  We need conclusion and this case needs to move

20  forward.  And kicking the can down the road another six months

21  from, MIG's perspective, is not going to resolve that issue.

22          THE COURT:  Thank you.  Just one more question for

23  you.

24          MR. KOKOLIS:  Sure.

25          THE COURT:  If the Court were to grant the motion

1   and approve an extension -- a modification in the form of an

2   extension, is your client going to cancel the auction that is

3   scheduled for next week?

4           MR. KOKOLIS:  There is no auction stand- -- I don't

5   know where opposing counsel obtained that information.

6           THE COURT:  So there is no auction scheduled at this

7   point?

8           MR. KOKOLIS:  Not yet.

9           THE COURT:  All right.  Thank you.

10          MR. KOKOLIS:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          Mr. Leavers?  Mr. Lichtenstein?  Would either of you

13  like to be heard?

14          MR. LEAVERS:  No, ma'am.

15          MR. LICHTENSTEIN:  No, Your Honor.  Thank you.

16          THE COURT:  Thank you.

17          Mr. Grochal?

18          MR. GROCHAL:  I get the last word?

19          THE COURT:  Well, maybe.  Well, Your Honor, three

20  quick points.  Mr. Kokolis claims that his client is being

21  materially and adversely affected by extending the plan.  I

22  would suggest that is mitigated by the 12 percent interest

23  that he will get over the next six months, if we need all the

24  six months to refinance.

25          His second --

1           THE COURT:  But that is at 12 percent; correct?

2           MR. GROCHAL:  It is what?

3           THE COURT:  The interest to Millenium is at 12

4   percent?

5           MR. GROCHAL:  Twelve percent.  Right.

6           THE COURT:  But their note says 18 percent and they

7   agreed to reduce the interest rate on the assumption that they

8   would be paid within a year.

9           MR. GROCHAL:  Okay.  But that gets me to my second

10  point, which is, Mr. Kokolis claiming that a settlement in a

11  Chapter 11 plan is unique.  And all I can tell you, Your

12  Honor, from the number of years I have practiced law, the

13  number of times that I have proposed a plan and every creditor

14  that merely said, "Where do I sign?" may be on one hand, but

15  maybe not.  Most plans are the product of negotiations, and

16  there are settlements and the like.

17          The question here is a six-month extension where

18  every other term of the plan remains the same, you know, a

19  material change.  And based on the cases about substantial

20  consummation, like the Litton case where I think it had to do

21  with extending a period, or even the ones that ruled against

22  it, as long as the plan doesn't change -- and the plan doesn't

23  change if just you move one goal post another -- further down

24  the field.

25          Last point, Ms. Stevens suggested that my clients --

1  shame on them for not knowing that someone who they never

2  borrowed money from -- EagleBank as opposed to Eagle Ventures

3  -- had filed something in the land records.  And I think that

4  that is a ridiculous standard to expect people to do.

5  Ms. Norris testified that she filed termination statements

6  herself because she was told that she was allowed to do that.

7  So as far as she knew, after Eagle Ventures was paid off in

8  2018 and she filed the termination statements, she was good.

9  So the notion that she should be checking the land records

10  because, who knows, some party with whom she never had a

11  lending relationship with would file something seems to be a

12  rather absurd standard.

13          That is all I have.  I will get to Your Honor's

14  question.

15          THE COURT:  No questions.  Thank you.

16          Ms. Stevens, Mr. Kokolis, anything further from you?

17          MR. KOKOLIS:  No.

18          MS. STEVENS:  (No verbal response.)

19          THE COURT:  All right, the Court is going to take a

20  short recess.  It is 3:20.  I expect to be back in about ten,

21  15 minutes.  I just want to get my thoughts together.

22          I also want to say, the Court found the arguments to

23  be very helpful and the presentation of the evidence, overall,

24  to be very helpful.  And, of course, the briefing -- there

25  were no new issues raised, which is always nice for the Court.

1   It allowed me to prepare in advance, to some extent.  So thank

2   you very much to counsel for the outstanding job, both in the

3   briefing and with arguments today.

4           I will be back in about ten, 15 minutes.

5           THE CLERK:  All rise.  Court is now in recess.

6       (Whereupon, at 3:18 p.m., a brief recess was taken and at

7   3:37 p.m., the proceeding resumed.)

8           THE CLERK:  All rise.

9           The United States Bankruptcy Court for the District

10  of Maryland now resumes its regular session.  The Honorable

11  Maria Ellena Chavez-Ruark presiding.  Please be seated.

12          THE COURT:  All right, thank you for your patience.

13          Before the Court is a motion to modify the confirmed

14  plan in this case.  That motion appears at docket number 290

15  and the Court has considered the objections raised by the

16  Office of the U.S. Trustee, Millenium, the second lien holder

17  who is SC210034 -- it just rolls off the tongue, doesn't it,

18  Mr. Leavers? -- and EagleBank and its affiliates as well.

19          The Court is going to grant the motion, but with a

20  condition.  And I will get to that in just a moment.

21          The Court starts its analysis with Section 1127 of

22  the Bankruptcy Code.  And when you break down Section 1127,

23  the Court picks out seven important components.

24          First of all, modification is after confirmation.

25  That is met here.

1          Before substantial consummation, I will talk about

2     that in a moment.

3          The modified plan meets the requirements of Section

4     1122, which deals with classification of claims.  The Court

5     finds that that has been satisfied here for all the reasons

6     that the original plan met the requirements of Section 1122.

7     The classification scheme has not changed.

8          Fourth, the modified plan meets the requirements of

9     Section 1123, which deals with the content of the plan.  And

10    again, for the same reasons that the original plan met the

11    requirements of 1123, the Court finds that the modified plan

12    does as well.

13         Number five, circumstances warrant.  And I will get

14    to that in a moment.

15         Number six, the modification is approved after

16    notice in a hearing.  And, of course, we have had notice of

17    the motion.  We are having the hearing today.  And parties and

18    interests have had, not only an opportunity to object, but

19    also to be heard.

20         And then finally, number seven, the Court confirms

21    the plan as modified under Section 1129.  And again, the

22    modified plan only seeks to change the timing of the

23    refinancing.  So for all of the reasons that the original plan

24    was found to meet the requirements of Section 1129, the Court

25    finds that the modified plan does as well.

 1          So let me talk about substantial consummation and

 2   whether the circumstances warrant.  As the U.S. Trustee's

 3   Office pointed out, the Debtor bears the burden of proof on

 4   whether substantial consummation has occurred here.  And

 5   Section 1101-2 defines the term "substantial consummation" for

 6   us.  There are three things that required for substantial

 7   consummation:  Transfer of all or substantially all property

 8   proposed by the plan to be transferred.  Frankly, the Court is

 9   not entirely clear on whether that one has been satisfied

10   because the plan does require that the Burtonsville property

11   be sold to Canaan Church, which is an impossibility at this

12   point because of the way the appeals turned out.  So we will

13   set that one aside for a moment.

14          The second is assumption by the debtor of the

15   business or management of all or substantially all property

16   dealt with by the plan.  It certainly seems to the Court that

17   that has been satisfied.

18          But really, it comes down to the third component

19   which is commencement of distributions under the plan.  Court

20   notes that the plan in Section 901 reserves in the Debtor the

21   right to modify the plan under Section 1127 as necessary to

22   carry out the purposes and effect of the plan.  And even --

23   the Court even noticed that the right to modify is stated in

24   the opening paragraph of the plan.

25          So as the U.S. Trustee's Office pointed out, the

1    confirmed plan is a binding contract on the Debtor and its

2    creditors and its parties in interest.  And there is a policy

3    in favor of finality.  We know that.  But Section 1127

4    expressly allows a modification when circumstances warrant.

5    And when the Court read the phrase "when circumstances

6    warrant" that indicated to the Court that an equity analysis

7    or a factual analysis is invoked.

8              Here, the equities favor modification.  If the

9    Debtors are able to refinance this debt, all creditors will be

10   paid in full.  The secured creditors are getting interest.

11   There is substantial equity.  By the Debtor's testimony, the

12   fair market value is 9 million, maybe 10 million if the

13   entitlement process is completed.  And claims are, depending

14   on what you look at, 4.5 million to 5.5 million.  So that

15   leaves a substantial amount of equity.

16             And the Court views this, in some respects, similar

17   to how it views a lift stay dispute.  There is case law that

18   says that a creditor is adequately protected if there is an

19   equity cushion in the property.  A secured creditor is

20   adequately protected if there is an equity cushion in the

21   property.  The reason being that as the creditor continues to

22   accrue interest, it is still going to be paid in full based on

23   the value of the property.

24             So the Court views this somewhat similarly.  There

25   is a huge equity cushion.  The Court is concerned that if

1   there is an auction of the property, Millenium will get

2   something, obviously.  May even be made whole.  But the big

3   question is, what about the other creditors?  We have

4   SC210034, we have Montgomery County.  And, of course, as I

5   stated earlier, the equity holders are parties in interest and

6   they have rights as well.

7         The Court believes that circumstances warrant a

8   modification here because the challenges that the Debtors have

9   faced were unforeseen.  Should we all have known that the

10   interest rates were going to change dramatically over a short

11   period of time?  Maybe.  But I think that what happened with

12   the lending market was a surprise, even to the most

13   experienced business professionals.

14         This Court has said many times over and over that it

15   believes that Mr. Norris and Ms. Norris are knowledgeable.

16   Mr. Norris, obviously, has a very deep background in real

17   estate development.  And Ms. Norris has time and time again

18   testified in this court from the financial side, from the

19   administrative side.  And the Court finds their testimony to

20   be compelling.

21         The status of the lending market, again, maybe

22   somebody could have foreseen it.  Maybe we should have

23   foreseen it.  But it was such a dramatic change in the market

24   over such a dramatic short period of time that the Court

25   concludes that that was an unforeseen challenge.

1          With regard to EagleBank, the Court is not

2    predetermining any of the EagleBank issues.  The impact of

3    what did or did not happen remains to be seen.  The impact may

4    be determined to be none.  But the fact is that those

5    continuation statements were filed at the time when the market

6    was starting to recover.  The witnesses testified about the

7    first six months and the difficulties in the first six months.

8    And then there was a recovery in the next six months.  And

9    right as that recovery started, the EagleBank continuations

10   were filed.  Again, it may mean something, it may mean

11   nothing.

12         The Court also notes that the Debtors have had a bit

13   of a bumpy road in trying to get replacement counsel in.

14   Mr. Simmons, who has appeared in this court many, many times

15   is well into his 70's.  God bless him for still practicing law

16   in his 70's, but he is retiring and his office is shutting

17   down.  So there may have been a hiccup there that may or may

18   not have played an impact.  But, ultimately, the Court finds

19   that the market conditions were an unforeseen challenge.

20         The Court has given the Debtors in these cases the

21   benefit of every doubt and has given the Debtors breaks, even

22   early in the case.  But the Court remains convinced that if

23   anyone can maximize the value for the benefit of all of the

24   parties in interest, it is Mr. and Ms. Norris.  So the Court

25   is going to grant the extension by six months for those

1  reasons.

2         Let me talk a little bit more about substantial

3  consummation.  The cases fall on both sides of the argument in

4  terms of when substantial consummation has occurred.

5         When distributions have commenced.  There is a line

6  of cases that say there has to be a substantial distribution.

7  Just a couple of those cases, Dean Hardwoods, Inc., 431 B.R.

8  387 out of the Bankruptcy Court for the Eastern District of

9  North Carolina, 2010; In Re: Donnell Horticulture, 2015

10 Westlaw, 1344254, decided on March 20, 2015; and In Re:

11 Litton, 222 B.R. 788 out of the Bankruptcy Court for the

12 Western District of Virginia, 1998.  These cases say that it

13 is not just a beginning of payments to a single creditor, but

14 the commencement of distribution to all or substantially all

15 creditors.

16         And then, of course, we have the cases cited by the

17 U.S. Trustee's Office.  We have the -- see if I can remember

18 the names.  I thought I wrote them down.  Here it is, Dam Road

19 Mini Storage.  In that case the Court agrees with Debtors'

20 counsel, the debtor did not act diligently in that case.  The

21 time has expired and a year later the debtor sought to modify

22 the plan.  Archway Homes -- well, and also in Dam Road Mini

23 Storage, as I recall, I believe almost 11 percent of the

24 distributions had been made.

25         In Archway Homes, I believe in that case seven of

1    the nine creditors had been paid.  So we are talking about

2    substantial distributions there.

3            The Court concludes -- and I will be frank, I don't

4    have a case to support this, but the Court concludes that when

5    we are looking at 1101-2(c) and we are talking about a

6    commencement of distributions, it has to be a material amount.

7    Counsel for the Debtors referred to it as *de minimis*.  I am

8    referring to it as material.

9            But again, I will give you the numbers, according to

10   the post-confirmation reports filed by the Debtors, ElderHome

11   paid $6,575 on claims totally $4,251,569.  That is taking the

12   admin claims out of the analysis because they were not paid

13   under the plan.  They were paid under court orders.  And

14   taking the equity distributions out of the analysis because,

15   as Ms. Norris testified, those were not actual distributions

16   to equity holders.

17           But that means that ElderHome paid 0.15 percent of

18   the claims.  That is .15 percent.  Not 15 percent.  .15

19   percent.  That is significantly less than one percent.

20           And Burtonsville Crossing is an even more extreme

21   illustration, $325 paid on $4,220,703.  That is 0.0077

22   percent.  That is not a material amount.  That is, in words of

23   Mr. Grochal, a *de minimis* amount.  And the Court finds that

24   that just does not rise to the level of what is contemplated

25   by Section 1101-2(c).

1            So let me address just a couple of comments made.

2    First of all, we heard that Section 7.03 of the plan requires

3    status -- quarterly status report with regard to the

4    entitlements and the permitting.  I don't believe the Debtors

5    have ever included that in their post-confirmation reports.

6    And the Court is telling the Debtors they need to do that.

7            With regard to some of the comments made by

8    Mr. Kokolis regarding Millenium, the one thing that the Court

9    really struggled with is the fact that Millenium did

10   everything it was supposed to do.  Millenium did everything it

11   agreed to do under the terms of the negotiated plan.  It made

12   irrevocable concessions, it reduced the amount of its debt, it

13   reduced the amount of its interest rate.  The interest rate

14   was reduced from 18 percent to 12 percent.  The claim was

15   reduced from almost $5 million to $3.3 million.

16           I will respectfully disagree with Mr. Kokolis.  I do

17   think that negotiated settlements are a common part of a

18   Chapter 11 plan, especially when there are multiple secured

19   creditors.  That is the way it goes.  But the fact that

20   Millenium dismissed its foreclosure cases with prejudice and

21   made these concessions, gave releases, not -- I am not just

22   thinking about the Debtors, but to the non-debtors who had

23   given releases.  And, yes, as Mr. Norris testified, Millenium

24   appears to be over-secured.  But, still, that was a negotiated

25   part of the original deal when the personal guarantees were

1  made and IDOT was given.  And then the concessions were part

2  of a negotiated deal that are included in the original plan.

3          Just a couple of more comments on the equities here

4  that I forgot to mention.  Not only is the Court thinking

5  about all of the parties in interest, but the Court is also

6  thinking about the community as a whole.  Remember what we are

7  talking about here.  We are not talking about a development of

8  townhouses or condos.  We are talking senior housing that is

9  going to serve the community and serve it in a very important

10 way.

11         And also, we heard earlier, and I am not sure to

12 what extent this is correct and to what extent it may be not

13 correct, but there was a statement that if the property is

14 sold at auction, the entitlements are lost.  So that

15 immediately upon the occurrence of the auction reduces the

16 value of the property.

17         So I apologize for my thoughts being a little bit

18 all over the place.  I wanted to make sure I addressed all of

19 the comments of counsel.  But that is the ruling of the Court.

20 The Court is going to grant the motion, but here is the one

21 condition.  The interest rate in favor of Millenium goes up to

22 18 percent after 60 days, okay?  It is a six-month extension.

23 For the first two months it will continue at 12 percent.

24 After 60 days, it goes up to 18 percent.  That is going to

25 give the Debtors an awful lot of incentive to get this done

1  sooner rather than later.  And it will not make Millenium

2  whole, but will get them closer to what their negotiated

3  settlement is.

4          Any questions for the Court?

5          MR. KOKOLIS:  Your Honor, is that 18 percent

6  retroactive back to the effective date of the plan?

7          THE COURT:  No.

8          MR. KOKOLIS:  Okay.

9          THE COURT:  That 18 percent kicks in 60 days after

10 the order modifying the plan takes effect.  And so it is 18

11 percent -- let's say the extension goes the whole six months,

12 you get 18 percent for that four months.  So 12 percent for

13 two months, 18 percent after that.  So for that additional

14 four months.

15         And I will say this because there has been some back

16 and forth on what if we end up here again in six months, 12

17 months, and over and over again?  The equities of this

18 situation played into the Court's analysis.  The Court really

19 focused on whether the circumstances warrant a modification.

20 And so I want to be clear to the Debtors, and specifically to

21 Mr. and Ms. Norris, that if we are back here in six months on

22 a similar request, that I think we can all assume that the

23 equities would be different at that point and the Court very

24 well may not make the same decision as it is making today.  So

25 I want to say that for the benefit of everyone.

1            I believe that it is in the best interest of all

2    parties for the Debtors to try and finish what they started

3    here.  If they are able to finish it, maybe it is not a

4    win/win as Mr. Grochal said several times, but it is pretty

5    close to it.  And it is far better for all of the parties in

6    interest, other than Millenium, and very well may turn out to

7    be the best possible result for Millenium.  Let's hope that

8    happens.

9            But if the refinancing does not occur in six months,

10   I think we are going to be going down a different path at that

11   point.

12           So, Mr. Grochal, it is your motion, will you draft

13   an order that says for the reason stated on the record, the

14   motion is granted, the extension is given.  Put a specific

15   date that the extension ends.  It will be six months from

16   today.  What is today?  October -- what is today?

17           MS. STEVENS:  Nineteenth.

18           MR. KOKOLIS:  Nineteenth.

19           THE COURT:  Nineteenth?

20           MR. GROCHAL:  Well, shouldn't it be six months from

21   the 24th?  Because that is when the first one runs out.

22           THE COURT:  Six months from the 24th.

23           MR. GROCHAL:  Okay.

24           THE COURT:  And the 18 percent interest kicks in 60

25   days after the 24th.  So --

1          MR. GROCHAL:  Okay.  All right.  I will circulate it

2     to the other parties.

3          THE COURT:  Please do.  And the Court would like you

4     to get a consent as to form.  So actually have Mr. Kokolis,

5     Mr. Lichtenstein, Mr. Leavers, and Ms. Stevens all sign off on

6     the order.  The Court understands you are not consenting to

7     the relief.  You are consenting just to the form of the order.

8          So, Mr. Grochal, if you can put consent as to form

9     and then have their signatures.  That way the Court will know

10    it has been run through everyone.

11         Any other questions?

12       (No verbal response.)

13         THE COURT:  Again, thank you very much for your very

14    thoughtful arguments.  This was not an easy issue, but the

15    Court is very comfortable with its ruling.  I think this is

16    the right result.  And I hope that in time everyone comes to

17    believe it is the right result.

18         MR. GROCHAL:  Thank you, Your Honor.

19         THE COURT:  All right, thank you.

20         MR. KOKOLIS:  Thank you, Your Honor.

21         THE CLERK:  All rise.  The Court is now adjourned.

22       (Whereupon, at 3:58 p.m., the proceeding was concluded.)

23

24

25

## C E R T I F I C A T E

    I hereby certify that the foregoing is a correct transcript from the provided electronic sound recording of the proceedings in the above-entitled matter.

/s/ Noemy Martinez 11/30/2023

Noemy Martinez       Date
Transcriber, CompuScribe